## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Ardalan Sadeghi-A,                                   Case No. 19-cv-2373 (MJD/ECW)

      Plaintiff,

    v.                                                  **ORDER**

Daimler Trucks North America LLC and
Freightliner Custom Chassis Corporation,

      Defendants.

---

This matter is before the Court on Plaintiff Ardalan Sadeghi-A's ("Sadeghi-A" or "Plaintiff") Amended Motion for Leave to Amend Complaint (Dkt. 34) ("Motion to Amend").[1]  For the reasons below, the Court grants the Motion to Amend.

## I.     BACKGROUND

**A.    Operative Complaint**

This action was removed to U.S. District Court for the District of Minnesota on August 28, 2019.  (Dkt. 1.)  Sadeghi-A alleges, in part, the following in the operative Complaint.  (*See* Dkt. 1-1.)

---

[1]    Sadeghi-A's motion is "Amended" because he had previously filed a motion to amend, on September 1, 2020.  (Dkt. 28.)  "Based upon the production of additional evidence and deposition testimony that had not been incorporated into the originally-filed proposed amended complaint, Plaintiff has revised the proposed amended complaint." (Dkt. 34.)  The Court denied the September 1 motion to amend as moot in view of the "Amended" Motion on October 1, 2020.  (Dkt. 41.)  The Court has only considered the "Amended" motion filed on September 18, 2020 and refers to it as the "Motion to Amend."

Sadeghi-A purchased a Newmar[2] London Aire recreational vehicle motorhome (the "Motorcoach" or "Motorhome") on August 1, 2016 from Steinbring Motorcoach Inc. in Minnesota.  (Dkt. 1-1 ¶¶ 1, 5.)  Defendant Daimler Trucks North America LLC ("Daimler") and Defendant Freightliner Customer Chassis Corporation ("Freightliner") (collectively, "Defendants") manufacture and sell motor home chassis to customers and dealers, which are an integrated part of motor homes sold to customers.  (*Id.* ¶¶ 2-3.) "Defendants designed, manufactured and warranted the chassis and related components of the Motorcoach, including specification and installation of the axle structures," and a manufacturer's express written warranty issued by Defendants was included in Sadeghi-A's purchase of the Motorcoach.  (*Id.* ¶¶ 6-7.)  "Since April 2015, Defendants have been aware of problems with design, manufacturing and/or installation of the tag axle on many of the chassis used for recreational vehicles and buses as it issued a service bulletin that Newmar described as applicable to a tag axle alignment concern for which it would assist customers in resolving the issue with Freightliner."[3]  (*Id.* ¶ 7.)  "Defendants did not disclose the [tag axle] issue or the service bulletin to Plaintiff."  (*Id.*)

---

[2]     Newmar is the make of the Motorcoach.  (Dkt. 1-1 ¶ 5; *id.* at 23; Dkt. 34-1 ¶ 5; *id.* at 31; Dkt. 40 at 14 ("Defendant Freightliner . . . manufactured and supplied the subject chassis to Newmar; Newmar then manufactured the motorhome on a later date and distributed it to its own dealership network.").)  As will be later described, Newmar issues "Technical Information Bulletins" or "Product Information Bulletins" regarding defects or problems in its motorhomes requiring service.  (*See* Dkt. 34-1 ¶¶ 21, 26; *id.* at 67, 72.)

[3]     "A tag axle is a non-driven, continuous weight-bearing axle."  (Dkt. 34-1 at 37.) The tag axle at issue in this case is a "passive steer tag axle," "a third most rearward axle designed to carry more vehicle weight and that allows the wheels on the passive steer axle to turn but does not have a direct steering input."  (*Id.* ¶ 8.)

The Complaint further alleges that the Motorcoach "has been the subject of several problems covered by warranty," and "[t]he problems . . . substantially, individually and together, impaired and continue to impair the value and use of the Motorcoach." (*Id.* ¶ 8.) The problems include "intermittent and unpredictable significant pulling to the left which increases the safety risk at higher rates of speed and is unrepairable by alignments; excessive vibration; [and] premature, uneven and unsafe tire wear." (*Id.*) Sadeghi-A "reported the defects and nonconformities and presented the Motorcoach to Defendants, its agents and authorized dealerships and repair facilities on many" occasions from August 2016 to March 2019. (*Id.* ¶ 9.) "The defects and warranty nonconformities . . . have not been corrected and remain a substantial impairment." (*Id.*) "Defendants['] repeated approach . . . has been to treat the problem as a need for an alignment and perform an alignment in an attempt to 'force' the Motorcoach to drive straight," but "[t]his has not been and cannot be successful in repairing the Motorcoach because the defective condition is a design, manufacturing and installation flaw that caused" problems that persist "regardless of how many times or how aggressively an alignment tries to overcompensate for such defective underlying conditions." (*Id.* ¶ 10.)

"At the time Plaintiff purchased the Motorcoach, Defendants were aware of the axle-related defects or with proper diligence should have been aware of the axle-related defects affecting the Motorcoach and did not disclose these true facts to Plaintiff, instead representing that the Motorcoach was free of defects and would drive true and proper." (*Id.* ¶ 12.) "Each time Defendants and their authorized service representatives represented that the Motorcoach needed an alignment as referenced in paragraph nine [in

3

the Complaint], they knew or with reasonable diligence should have known the true nature of the axle problems but failed to disclose and concealed the true nature of the problem." (*Id.* ¶ 13.)

Sadeghi-A "relied upon the concealment [of the axle-related defects] in purchasing the Motorcoach" and "would not have purchased the Motorcoach or would have purchased a motorhome with a different manufacturer's chassis" "[i]f Defendants had disclosed the axle-related defects." (*Id.* ¶ 12.) He also "relied upon Defendants' misrepresentations in accepting their repeated false attempts to repair and continuing to maintain ownership in an attempt to resolve the problem with Defendants." (*Id.* ¶ 13.)

Based on the allegations in the Complaint—which have not been recounted here in their entirety—Sadeghi-A asserted five counts: (1) Violation of Minnesota Lemon Law, Minn. Stat. § 325F.665; (2) Violation of Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; (3) Breach of Express Warranty, based on the express written warranty provided by Defendants; (4) Violations of Minn. Stat. § 325G.17-.20, which are Minnesota's statutes applicable to consumer warranties; and (5) Violations of Minn. Stat. § 325F.69, Minnesota's Consumer Fraud Act. (*Id.* ¶¶ 17-46.) Sadeghi-A requested relief of "(A) Awarding Plaintiffs damages for the violation of Minnesota law; (B) Granting injunctive relief to prohibit any conduct that violates Minnesota's Consumer Fraud Act; [and] (C) Awarding Plaintiff his attorneys' fees and costs." (*Id.* at 18-19.)[4]

Defendants filed an Answer to the Complaint on August 30, 2019. (Dkt. 7.)

---

[4]     Unless otherwise noted, all page numbers refer to the CM/ECF pagination.

**B.     Proposed Amended Complaint**

Sadeghi-A moved to amend the Complaint on September 18, 2020.  (Dkt. 34.)
The parties submitted memoranda (Dkts. 35, 40), and the Court held oral argument on
October 1, 2020 (Dkt. 41).  After the hearing, on October 8, 2020, Sadeghi-A filed a
letter "submit[ting] . . . authorities limited to questions [the Court] raised at the motion
hearing."  (Dkt. 42 at 1.)

The changes in the Proposed Amended Complaint generally add factual
allegations regarding Defendants' development and testing of the type of tag axle that
was incorporated into Sadeghi-A's Motorcoach and Defendants' knowledge of and lack
of disclosure regarding defects in the tag axle, as well as several new counts.  (*See
generally* Dkt. 34-2 (redlined Proposed Amended Complaint).)  According to Sadeghi-A,
the new allegations are based on documents produced and deposition testimony, in mid-
August 2020 and on September 10, 2020, respectively, by third-party Hendrickson USA,
LLC, which designed and supplied the tag axle to Defendants.  (Dkt. 34-1 ¶¶ 9, 42-43;
Dkt. 35 at 1, 4.)  Sadeghi-A alleges, in part, the following in the Proposed Amended
Complaint.  (*See generally* Dkt. 34-1.)

**1.     Defendants' Development of and Knowledge of Defects in the USB Tag
Axle**

The tag axle at issue in this case is "a passive steer tag axle" and "was given the
brand name 'Ultra-Steer B Series' or 'USB.'"  (*Id.* ¶¶ 7-8.)  The USB tag axle was in
development as of 2014 and tested through at least January 2015.  (*See id.* ¶¶ 9-11.)  In
December 2014, "before testing was even complete on the prototype USB tag axle, an
article was published in RV Pro magazine," in which Freightliner representatives

"emphasized the features of the USB tag axle" and made certain representations about the performance of the USB tag axle. (*Id.* ¶ 10; *see id.* at 48-53, Ex. D (*RV Pro* article).) According to the Proposed Amended Complaint, Freightliner also posted a video to YouTube at the same time "in which it makes false representations" about the USB tag axle's performance. (*Id.* ¶ 10.)

"During testing of the USB tag axle on the only test vehicle on which it was installed, in January of 2015, a control arm fastener bolt broke. Numerous other instances during testing revealed malfunction of the mechanism that allows the wheels to turn or holds them straight." (*Id.* ¶ 11.)[5]

"Defendants' production of the USB tag axles on recreational vehicle chassis commenced in April of 2015. After that time and before August of 2015, reports were received by Hendrickson that it raised upon inquiry to Defendants about the USB tag axles being off-center." (*Id.* ¶ 12.) "Third-party subpoenaed documents and publicly available documents show a substantial volume of complaints after the USB tag axle went into production and continues through the present time frame." (*Id.*; *see also id.* ¶ 22 ("Before and after August of 2016, Defendants have received but withheld from disclosure in this lawsuit, customer complaints, warranty claims and out-of-warranty 'goodwill' claims related to the USB tag axle defects causing the drivability problems.").) Sadeghi-A identifies early August 2015 as the time when Defendants, along with

---

[5]      It is not clear from the Proposed Amended Complaint who performed this testing. (*See* Dkt. 34-1 ¶ 11.)

Hendrickson, "first became aware of the design mechanical basis for the problem causing customer complaints":

> The reports caused Defendants and Hendrickson in early August 2015, to analyze the USB tag axle to determine what was causing the drivability problems.  Defendants discovered that a lateral shifting of the USB tag axle that was not part of the design and was causing the USB tag axle to shift off-center was the anomaly that was the starting point for the problem.

(*Id.* ¶ 13.)

> Further, by August 2015, Defendants were aware of the following:

> Defendants were aware that the USB tag axle design and its manufacturing process was causing USB tag axles to be installed on chassis off-center . . . . When a post-manufacturing, pre-delivery alignment was performed on chassis with an off-center USB tag axle, the alignment results could show as within the range of acceptable tolerance when in fact it was not . . . thereby causing chassis to be delivered to endstage builders out of alignment, unable to hold alignment and/or with false alignment readings.

(*Id.* ¶ 14.)

In addition to being delivered out of alignment, Defendants knew that "the USB tag axle defects [] could not be remedied but had to be redesigned and replaced."  (*Id.* ¶ 28; *see also id.* ¶ 27 (Defendants "knew that the defect could not be repaired since it was being redesigned and replaced.").)  With regard to Sadeghi-A's Motorcoach, "Defendants communicated with each authorized service repair facility each time it was presented for warranty repair by Plaintiff and authorized the purported repair attempts on the Motorcoach."  (*Id.* ¶ 29.)  "Defendants['] repeated approach and instruction to authorized repair facilities . . . has been to falsely treat the problem as a need for an alignment and attempt to perform an alignment," despite knowing "that this cannot be

successful in repairing the Motorcoach because [of] the USB tag axle defects that caused

the USB tag axle to be . . . unable to achieve proper alignment regardless of how

many times or how aggressively an alignment tries to overcompensate for such defective

underlying conditions."  (*Id.*; *see also id.* ¶ 52 ("Defendants and [Freightliner's Dealer

Operations and Litigation Administrator] Mr. Rostenbach knew the USB tag axle was

broke[n], that it was not and could not be brought within specification, and that the repair

or replacement it needed was not routine maintenance, and that the USB tag axle defects

which had been known since at least August of 2015 could not be repaired.").)

"Defendants' design engineer"[6] informed Hendrickson by email on April 6, 2016

"that they were 'receiving reports from sales and service that the tag alignment issue is

causing issues at dealers.  The offset to the left due to improper assembly and alignment

is causing lost sales.'"  (*Id.* ¶ 15.)  "Defendants also admitted that for the year since

production began that 'Nothing to date has corrected the issue.'"  (*Id.*)  According to

Sadeghi-A, "Defendants implored Hendrickson that the axle needed to be redesigned,"

"[n]ot because of the effect on safety but because of the impact on profitability."  (*Id.*)

Defendants and Hendrickson worked on redesigning the USB tag axle starting in April

2016 and had done so by October 2016.  (*Id.* ¶¶ 17-18.)

---

[6]     It is unclear which Defendant employed this design engineer.  The Proposed
Amended Complaint names Todd Traynham as "Defendants' engineer who designed the
USB tag axle integration to the chassis" (*id.* ¶ 20), and other allegations refer to
Traynham as "the design engineer" or "Defendants' design engineer" (*id.* ¶¶ 21, 40, 43).
Another allegation states that Mr. Traynham works for Freightliner.  (*Id.* ¶ 40.)
Traynham was deposed in June 2020.  (*Id.* ¶ 42.)

Sadeghi-A also alleges that the USB tag axle defects had an effect on the safety of vehicles containing the USB tag axle and that Defendants were aware of the safety issue. (*See, e.g.*, *id.* ¶ 19 ("The drivability problems caused by the USB tag axle defects relate to the stability and control of the Motorhome and implicated safety.")[7]; *id.* ¶ 20 (Defendants' engineer stated on November 2, 2016 that the tag axle's effects "makes this a safety relevant issue for [Freightliner]"); *id.* ¶ 23 ("Because Defendants were aware of the USB tag axle defects since 2015 and that it . . . posed a substantial risk to safe operation of the vehicles on which they were installed . . . "); *id.* ¶ 54 ("The detrimental impact of the USB tag axle defects on the safety of the Motorcoach was revealed in an inspection in May of 2020 . . . .").)

"Defendants' [sic] continued manufacturing and delivering chassis containing the USB tag axle without disclosure or resolution of the defect or its effect on recreational vehicles drivability, stability, control or safety, through April of 2016." (*Id.* ¶ 15.) Sadeghi-A's "Motorcoach was manufactured by Defendants on April 15, 2016," with the USB tag axle as originally designed installed. (*Id.* ¶ 16.) "Although Defendants had been redesigning the USB tag axle during much of 2016, Defendants continued to manufacture and sell the defective USB tag axles until at least March of 2017 when it

---

[7]        Sadeghi-A defines the "drivability problems" as "the pulling, wandering, vibrating dogtracking, [and] premature and abnormal tire wear," all of which are caused by the USB tag axle defects and "compounded by the other Motorcoach defects." (Dkt. 34-1 ¶ 19.) Sadeghi-A attaches and "incorporates[s]" his expert's disclosure and opinions in his Proposed Amended Complaint, which include "opinions as to the defective design, component stackup, manufacturing and servicing of the USB tag axle," as well as to "additional defects in the Motorcoach chassis . . . that relate to the USB tag axle defects but are part of other systems" and are referred to as the "other Motorcoach defects." (*Id.*; *id.* at 54-65, Ex. E (Expert Witness Report of Robert McElroy, Ph. D.).)

started production of the new design which eliminated the defective components . . . ."

(*Id.* ¶ 39.)

### 2.   Defendants' Nondisclosure of Defects of the USB Tag Axle

"With full knowledge of the USB tag axle defects that caused the drivability problems affecting vehicle performance and safety, Defendants concealed and did not disclose the USB tag axle defects directly to Plaintiff, government regulators or any customers."  (*Id.* ¶ 24.)  Sadeghi-A alleges as follows:

> Because Defendants were aware of the USB tag axle defects since 2015 and that it involved defects that were inconsistent with the design intent, were hidden material defects, for which Defendants had greater and complete knowledge and posed a substantial risk to safe operation of the vehicles on which they were installed, Defendants had a duty to disclose such defects and to disclose such defects to Plaintiff.

(*Id.* ¶ 23.)

On August 9, 2016, "Newmar published . . . an information bulletin with [Freightliner] . . . [that] contained vague and misleading information it received from Defendants."  (*Id.* ¶ 26; *id.* at 71-94, Ex. G.)  Regarding this information bulletin ("Product Information Bulletin 458" or "PIB 458"), Sadeghi-A alleges:

> Defendants knew that the information it provided to Newmar for publication was not complete or accurate because it did not explain the specific defect or condition, it provided deficient and improper instructions that purported to provide a repair solution when the instructions admittedly did not correct but actually perpetuated the original defective manufacturing process, and it misrepresented the population of units affected by the defect by not including all vehicles potentially affected by the defective design and manufacturing which was ongoing and unresolved.

(*Id.* ¶ 26.)  "Defendants engaged in this artifice . . . when it knew that the defect could not be repaired since it was being redesigned and replaced, when it knew that the repair

10

instructions it published did not address the defective condition and when it knew that more units were affected . . . ." (*Id.* ¶ 27.) "Instead of fully, accurately and timely disclosing to Newmar and all of Defendants' customers who had purchased chassis with a USB tag axle, . . . Defendants failed to directly disclose at all and withheld information from its customer network and the ultimate consumer purchasers, the actual USB tag axle defects . . . ." (*Id.* ¶ 28.)

When Sadeghi-A's Motorcoach was presented for warranty repair, "Defendants['] repeated approach and instruction to authorized repair facilities . . . has been to falsely treat the problem as a need for an alignment and attempt to perform an alignment," despite knowing "that this cannot be successful." (*Id.* ¶ 29.) Sadeghi-A presented his Motorcoach for repair at various authorized repair facilities, and communicated otherwise with Defendants, at various times from at least August 2016 through June 2019, but neither Defendants nor any of the authorized repair facilities disclosed the USB tag axle defects to Sadeghi-A, despite Defendants' awareness of the defects. (*See id.* ¶¶ 29-38, 40-41, 50-52.) The Proposed Amended Complaint states that Sadeghi-A complained about the difficulty in driving and maintaining control of the Motorcoach to Newmar and Freightliner "right after delivery" and states that on August 16, 2016 "Defendants' authorized service facility Truck Centers, Inc. inspected the Motorcoach for repair and was in communication with [Freightliner] but neither Defendants nor Truck Center disclosed the USB tag axle defects to Plaintiff in connection with this warranty repair effort." (*Id.* ¶ 30.) The Proposed Amended Complaint identifies other communications with Defendants or their representatives, including "Defendants' head Service Manager

David Hoover" on August 23, 2016; Truck Centers in November 2016; "Defendants'
authorized repair facility Young Truck" on November 23, 2016; and "Defendants'
employee Aaron Hesch" on November 30, 2016 (who drove the Motorcoach and
witnessed the vehicle pulling). (*Id.* ¶¶ 31-33, 35, 37.) Sadeghi-A also "directly notified
upper level management at Daimler and [Freightliner] and Defendants' general counsel"
of the "unrepaired defective conditions" in "January through March 2017," including
corresponding with the Chief Executive Officer of Daimler in January 2017. (*Id.* ¶ 38; *id.*
at 43-47, Ex. C (letter to Daimler CEO)[8].)

### 3. Defendants' Intent and Sadeghi-A's Reliance

"Defendants['] failure to provide a timely, accurate, full and complete description
of the USB tag axle defects on his Motorcoach was intended to and caused Plaintiff to
enter into a purchase and on August 1, 2016, take delivery of the Motorcoach containing
the USB tag axle defects." (*Id.* ¶ 25.) Further, "Defendants' inability or unwillingness to
repair the Motorcoach and its refusal to disclose and attempt to cover-up the USB tag
axle defects . . . was intended to induce Plaintiff and other customers to accept false
repair attempts and to avoid lost sales . . . ." (*Id.* ¶ 49.)

"Plaintiff was not aware of the USB tag axle defects, did not have access to the
information Defendants had and would not have purchased the Motorhome or would
have purchased one with a different manufacturer's chassis if he had known about the
USB tag axle defects." (*Id.* ¶ 25.) "Plaintiff relied upon Defendants' pretend compliance

---

[8]     The first page of the letter precedents the Exhibit C slip sheet. (Dkt. 34-1 at 43-44.)

with its warranty obligations, even though it was really concealing from Plaintiff the USB

tag axle defects.  Plaintiff continued to seek repair and a remedy but was misled by

Defendants . . . ."  (*Id.* ¶ 53.)

### 4.    Amendments to Counts

Based on the proposed factual allegations, Sadeghi-A asserts two new and one

new-in-part claims.  The first four counts—for Violation of Minnesota Lemon Law,

Violation of Magnuson-Moss Warranty Act, Breach of Express Warranty, and Violations

of Minn. Stat. Sec. 325G.17-.20—are unchanged in the Proposed Amended Complaint,

except for the amount of damages claimed in each count.  (*See id.* ¶¶ 57-79; Dkt. 34-2

¶¶ 57-79 (redlined Proposed Amended Complaint).)

Count V is a new count for Common Law Fraud.  (*See* Dkt. 34-1 ¶¶ 80-91; Dkt.

34-2 ¶¶ 80-91 (redlined Proposed Amended Complaint).)  In this count, Sadeghi-A

alleges as follows:

> 81.    At the time that Defendants manufactured and delivered the chassis for the Motorcoach, Defendants knew that it had the USB tag axle defects that caused the drivability problems.

> 82.    Because of the known material and hidden defects; Defendants' clear, greater and specialized knowledge of these facts from customer complaints and its own investigation of the defects, communication with the supplier and redesign of the defective components; because Defendants disclosed vague and misleading half-truths about the defect; because of the risk they pose to the safe operation of the vehicle and under regulatory obligations to report and disclose; Defendants had a duty to disclose the USB tag axle defects.

> 83.    Defendants did not disclose known defects in the design, manufacturing or installation of the axle structures to Plaintiff at or before he took delivery and do not disclose them to other purchasers in order to induce purchasing of chassis and to sell chassis with the defective axle structure.

84.     Defendants also failed to timely, fully and accurately disclose and misrepresented the specific defective conditions as a vague tag axle alignment concerns when it provided information to Newmar that they knew and intended would be published to customers that might be affected by the problem, including when Plaintiff discovered and relied upon it in and after November 2016.

85.     Defendant failed to disclose and misrepresented the accurate and complete population of vehicles affected by the defective condition which actually spanned a two-year production period and included Plaintiff's Motorcoach.

86.     Defendants failed to disclose and misrepresented the USB tag axle defects as needing routine alignment maintenance each time it was presented for repair by Plaintiff when Defendants knew it needed a replacement of defective components and were unwilling to repair it.

87.     Defendants failed to disclose and misrepresented that the USB tag axle defects each time it was returned to Plaintiff after it was presented for repair because the defective condition was not repaired or replaced and the Motorcoach was not aligned to within specification because the USB tag axle components were not properly adjusted and could not be adjusted to a proper position and achieve a true alignment thereby rendering the alignment printouts false.

88.     Defendants misrepresented to Plaintiff that he was entitled to and receiving fair and objective warranty treatment when they knew that they could not and were unwilling to repair or replace the defective components and failed to disclose that he was subject to extraordinary treatment to avoid repairing or replacing the defective components.

89.     Defendants' concealment and misrepresentations were made with knowledge of their falsity.  Defendants intended to deceive Plaintiff to induce his and others' purchasing of vehicles on which its USB tag axle was installed, to induce payments for routine maintenance and out-of-pocket repair attempts, to avoid its obligation to repair or replace his Motorcoach or the USB tag axle and to avoid the responsibility to recall or repair/replace other vehicles on which the USB tag axle has been installed.

90.     Plaintiff reasonably relied upon Defendants' failures to disclose and misrepresentations in purchasing the Motorcoach, in attempting to have it repaired and in continuing to attempt to obtain repair or replacement during the warranty period.  Plaintiff would not have purchased the Motorhome or would have purchased a motorhome with a different

manufacturer's chassis if the defect had been disclosed and would have demanded replacement of the tag axle or immediately returned it if the defect and not expended money on repair attempts and trying to determine the true problem if the defects and their unrepairability had been disclosed.

91. As a direct and proximate result of Defendants' misrepresentations and failure to disclose, Plaintiff has suffered pecuniary damages including the loss or diminution in value of the Motorhome, out of pocket expenditures invested into the Motorhome, money expended on damage caused to other parts of the Motorhome, attempting to obtain repairs, expended on investigating the defects, expended on litigation, as well as, time invested in all of the above and loss of use, enjoyment, aggravation damages all in an amount to be determined at trial in excess of $75,000, including any exemplary damages, civil penalties, attorneys' fees and costs as allowed by Minnesota law.

(Dkt. 34-1 ¶¶ 80-91.)

Count VI in the Proposed Amended Complaint is "Violations of Minn. Stat. Secs. 325F.69 and 325D.44," the latter of which—Minnesota's Deceptive Trade Practices Act—was not included in the operative Complaint. (*Id.* at 24; *see also* Dkt. 34-2 at 24.) This Count includes new allegations that "Defendants intended that Plaintiff and other customers rely upon its misrepresentations as published in RV Pro Magazine and on You Tube and marketing material" and that "[t]he represented beneficial attributes . . . of the USB tag axle were part of the reason Plaintiff purchased a chassis with the USB tag axle." (Dkt. 34-1 ¶ 96.) Further, "Defendants intended that Plaintiff and other customers rely upon its non-disclosure of the USB tag axle defects to induce purchasing, its misleading half-truth PIB 458 and scheme to lull Plaintiff and other customers to accept false repair attempts and pay for false routine maintenance." (*Id.* ¶ 97.) The Proposed Amended Complaint also alleges, "Defendants have willfully engaged in the false representations and non-disclosure and know that it is deceptive." (*Id.* ¶ 98.) The

operative Complaint alleges, "A public benefit will be fulfilled if Defendant is liable for and prohibited from concealing the defective axle structure of its chassis" (Dkt. 1-1 ¶ 45), while the Proposed Amended Complaint modifies that allegation by adding, "A public benefit will be fulfilled if Defendant is liable for and prohibited from making false representations about and concealing the USB tag axle defects. The false representations remain published and the defective condition of the USB tag axle exists in" certain vehicles (*id.* ¶ 99). The Proposed Amended Complaint further alleges, "As a direct and proximate result of the violations of Minn. Stat. Secs. 325F.69, 325D.44 and common law, Plaintiff is entitled to injunctive relief, compensatory and exemplary damages, civil penalties, attorneys' fees and costs as allowed Minn. Stat. 8.31 and 325D.45." (*Id.* ¶ 101.)

Count VII in the Proposed Amended Complaint is a new claim for Punitive Damages under Minn. Stat. § 549.20. (*See* Dkt. 34-2 at 26 (redline, showing as Count VI).) This Count alleges, in part: "Defendants' failure to disclose, as more fully pled in the previous count and in the factual allegations herein, and misleading of Plaintiff were in deliberate disregard of his and[,] since they were part of a broader scheme to conceal and mislead, other customers' rights and safety." (Dkt. 34-1 ¶ 103.) Specifically, "Defendants have known since 2015, that the USB tag axle defects create a high degree of probability that Plaintiff and other customers were fraudulently induced to purchase chassis with defective USB tag axles," and "Defendants deliberately proceeded to not disclose and misrepresent the USB tag axle defects in conscious and intentional disregard or indifference of a high degree of probability of injury to Plaintiff's and others' rights."

(*Id.* ¶ 104.)  Similarly, "Defendants deliberately proceeded to not disclose and misrepresent the USB tag axle defects in conscious and intentional disregard or indifference of a high degree of probability of injury to Plaintiff's and others' safety." (*Id.* ¶ 105.)  "After Plaintiff and other customers purchased chassis containing the USB tag axle defects, Defendants acted with deliberate disregard for the rights of Plaintiff and other customers" and "consciously or intentional[ly] disregarded or [were] indifferent to a high degree of probability that Plaintiff and other customers would continue to use chassis containing the USB tag axle defects and accept false repair attempts and incur out-of-pocket expenses on repair attempts and damages . . . to the detriment of their property rights."  (*Id.* ¶ 106.)  Similarly, "[a]fter Plaintiff and other customers purchased chassis containing the USB tag axle defects, Defendants acted with deliberate disregard for the rights of Plaintiff and other customers" and "consciously or intentional[ly] disregarded or [were] indifferent to a high degree of probability of injury to Plaintiff's and other customers' safety caused by the drivability problems from continuing to use chassis containing the USB tag axle defects and accept false repair attempts."  (*Id.* ¶ 107.) "Defendants' failure to disclose the USB tag axle defects and their misleading representations . . . were authorized by Defendants and were undertaken or approved by employees in a managerial capacity with authority to establish policy and make planning level decisions and were acting in the scope of that employment; or were ratified and approved while knowing of its character and probable consequences."  (*Id.* ¶ 108.) "Defendants' misconduct sacrificed motor vehicle safety in order to avoid lost sales and enhance[e] profitability.  The misconduct and any concealment of it has persisted since

August of 2015 and . . . still poses a high degree of hazard . . . ."  (*Id.* ¶ 109.)  Finally,

"[i]n consideration of Defendants' financial condition, and to deter the self-interested

motivation of Defendants' wanton, willful and reckless disregard of Plaintiff and others'

rights and safety, a substantial award of punitive damages is warranted."  (*Id.* ¶ 110.)

## II.   <u>LEGAL STANDARD</u>

Rule 15 sets the general standard for amending pleadings in Federal court and

provides that "[t]he court should freely give leave when justice so requires."  Fed. R. Civ.

P. 15(a)(2).  The determination as to whether to grant leave to amend is entrusted to the

sound discretion of the trial court.  *See, e.g.*, *Niagara of Wisc. Paper Corp. v. Paper*

*Indus. Union-Mgmt. Pension Fund*, 800 F.2d 742, 749 (8th Cir. 1986) (citation omitted).

The Eighth Circuit has held that although amendment of a pleading "should be allowed

liberally to ensure that a case is decided on its merits, there is no absolute right to

amend."  *Ferguson v. Cape Girardeau Cty.*, 88 F.3d 647, 650-51 (8th Cir. 1996)

(citations omitted).

Denial of leave to amend may be justified by "undue delay, bad faith on the part of

the moving party, futility of the amendment or unfair prejudice to the opposing party."

*Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371

U.S. 178, 182 (1962)); *see also Hillesheim v. Myron's Cards and Gifts, Inc.*, 897 F.3d

953, 955 (8th Cir. 2018) (citation omitted) ("A district court's denial of leave to amend a

complaint may be justified if the amendment would be futile.").  "Denial of a motion for

leave to amend on the basis of futility means the district court has reached the legal

conclusion that the amended complaint could not withstand a motion to dismiss under

Rule 12(b)(6) of the Federal Rules of Civil Procedure. Accordingly, in reviewing a denial of leave to amend we ask whether the proposed amended complaint states a cause of action under the *Twombly* pleading standard . . . ." *Zutz v. Nelson*, 601 F.3d 842, 850-51 (8th Cir. 2010) (citation and marks omitted); *see also In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir. 2007) ("[W]hen a court denies leave to amend on the ground of futility, it means that the court reached a legal conclusion that the amended complaint could not withstand a Rule 12 motion.").

On a motion to dismiss filed pursuant to Rule 12(b)(6), the Court must take the well-pleaded allegations of a claim as true, and construe the pleading, and all reasonable inferences arising therefrom, most favorably to the pleader. *See Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). To survive a motion to dismiss, a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Additionally, when a claim is for fraud, "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in

them, and what was obtained as a result." *United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012) (cleaned up). "In other words, Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 439 (8th Cir. 2013) (cleaned up). "The purpose of Rule 9(b) is to provide the defendant with notice of and a meaningful opportunity to respond specifically to charges of fraudulent conduct by apprising the defendant of the claims against it and the facts upon which the claims are based." *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-md-2359, 2013 WL 3717743, at *6 (D. Minn. July 15, 2013) (citing *Com. Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995)). "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (cleaned up). "But Rule 9(b) does not require that the exact particulars of every instance of fraud be alleged, so long as the complaint includes enough detail to inform the defendant of the core factual basis for the fraud claims." *Ransom v. VFS, Inc.*, 918 F. Supp. 2d 888, 898 (D. Minn. 2013) (cleaned up). Ultimately, "[t]he level of particularity required depends on the nature of a case." *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012) (citing *BJC Health Sys.*, 478 F.3d at 917).

### III.   ANALYSIS

Sadeghi-A states that he "seeks leave to amend his complaint to specify in more detail the allegations of his fraud claims and to add a claim seeking punitive damages." (Dkt. 35 at 1.) Specifically, he states that discovery in August 2020 "yielded the

particular facts . . . that permit pleading with greater specificity the true cause of the defect, that it was known by Defendants much earlier than Defendants acknowledged and that it is not just 'confusion' over how to align a couple of chassis," and that Defendants' concealment and misrepresentation "fraudulently-induced Plaintiff's and other customers' purchase of chassis with the USB tag axle defects and caused Plaintiff and other customers to continue to use, attempt to obtain repair and to be forced to pay for and drive chassis with the USB tag axle defects in deliberate disregard of their rights and safety." (*Id.* at 1-2.) Defendants argue that the Motion to Amend should be denied because it is futile and does not plausibly state a claim for relief in several respects. (Dkt. 40 at 3, 12-13, 17, 30.)[9]

A.   **Defendants' "Design Defect" Arguments**

Much of Defendants' opposition asserts that Sadeghi-A seeks to make "new design defect allegations" and that his new claims are premised on a design defect theory for which he cannot recover. (Dkt. 40 at 3-4 ("These new design defect allegations are then incorporated in and underpin each of Plaintiff's claims in the amended complaint."); *see also id.* at 11 ("Plaintiff's new design defect allegations seek to shoe-horn strict liability and negligence standards into a breach of warranty case by imposing a duty on Defendants to both replace—and, evidently, cease production and disclose to all actual and potential customers—an allegedly poor design."); *id.* at 18 ("Plaintiff's fraudulent omission claim is simply a strict liability design defect claim re-packaged as fraud.").)

---

[9]   Defendants do not oppose the Motion on any grounds other than futility (*see* Dkt. 40), and the Motion to Amend is timely under the operative Second Amended Scheduling Order (*see* Dkt. 39 at 2).

The Court addresses Defendants' "design defect" arguments in this Section before reaching the specific claims that Sadeghi-A seeks to add in his Proposed Amended Complaint.

First, Defendants argue that "Plaintiff's allegations against Defendants—and any duties owed by Defendants—derive from the warranties provided with respect to the subject chassis," and the warranty "does not provide warranty coverage for alleged design defects." (*Id.* at 4-5; *see also id.* at 6 ("[T[hese allegations are also futile because a design defect claim is tort-based claim, and is not a cognizable claim in this breach of warranty case where duties arise only from contract."); *id.* at 12 ("[I]f a product's design causes it to have characteristics that are undesirable or unwanted—but which do not cause injury to person or property—a buyer's remedy, if any, is found in warranty and contract law.").) Sadeghi-A set forth his warranty claims separately from his new allegations and claims for common law fraud, violation of Minnesota's Deceptive Trade Practices Act, and punitive damages. (Compare Dkt. 34-1 ¶¶ 62-79, *with id.* ¶¶ 80-110.) Defendants cite no authority for the proposition that Sadeghi-A is precluded from bringing those new claims based on knowledge of a design defect and failure to disclose the defect simply because his warranty claims may not be based on a design defect. Further, Defendants' description of his Sadeghi-A's claims as "repackage[ed]" warranty claims (*see, e.g.*, Dkt. 40 at 22) to support their futility argument is itself a "repackaging" of those non-warranty claims as warranty claims. Sadeghi-A has separately alleged claims for common law fraud, violation of Minnesota's Deceptive Trade Practices Act,

and punitive damages, and those claims must be evaluated as he alleged them, not as Defendants characterize them.[10]

Second, Defendants argue that Sadeghi-A "has suffered no harm to his person, has suffered no harm to his 'tangible person [sic] property other the goods,' and has suffered no harm to his real property," and so "[t]he economic loss doctrine therefore bars Plaintiff from utilizing product defect claims, such as a design defect theory, to recover damages for harm to the product itself."  (Dkt. 40 at 7-8 (discussing Minn. Stat. § 604.101).)  Defendants focus on the subdivision of the statute limiting product defect tort claims (*id.* at 7), which states, "A buyer may not bring a product defect tort claim against a seller for compensatory damages unless a defect in the goods sold or leased caused harm to the buyer's tangible personal property other than the goods or to the buyer's real property."  Minn. Stat. § 604.101 subd. 3.  But, again, Sadeghi-A seeks to add claims for common law fraud, violation of Minnesota's Deceptive Trade Practices Act, and punitive damages, and while he uses the word "defect" to refer to the problem with the USB tag axle, he has not styled any claim as a product defect tort or suggested

---

[10]   Defendants make similar arguments when addressing the fraudulent nondisclosure claim, arguing, "With respect to alleged fraud during the post-sale service of the subject chassis, the amended complaint's allegations confirm that this claim is simply a breach of warranty claim repackaged as fraud."  (Dkt. 40 at 22.)  But again, this argument misses the key inquiry: if Sadeghi-A has adequately alleged a duty Defendants owed to him arising outside of the contract, as well as the other elements of fraud, then nothing prevents Sadeghi-A from asserting a fraud claim with his warranty claims.  *See Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, No. 20-CV-1731 (ECT/KMM), 2021 WL 465323, at *14 (D. Minn. Feb. 9, 2021) (quoting *AKA Dist. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998)) ("A fraud claim independent of the contract is actionable, but it must be based upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent inducement.").

that he is putting forward a design defect theory.  Minnesota's economic loss doctrine statute does not permit "a common law misrepresentation claim against a seller relating to the goods sold or leased **unless the misrepresentation was made intentionally or recklessly**."  Minn. Stat. § 604.101 subd. 4.  Sadeghi-A contends that his fraud claim "is based upon intentional misrepresentation which is not prohibited by the economic loss doctrine."  (Dkt. 35 at 16 (citing *Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1145 (D. Minn. 2016)).).  Moreover, Defendants acknowledge this exception to the economic loss doctrine and implicitly concede that, if intentional misrepresentations are otherwise adequately alleged, the economic loss doctrine does not bar a claim for common law misrepresentation.  (Dkt. 40 at 8 n.2 ("Although Plaintiff attempts to plead around [Minn. Stat. § 604.101, subd. 4] by contending that his fraudulent misrepresentation claim is based upon intentional, not negligent, misrepresentations, for the reasons discussed below that amended claim fails as well.".)

Third, Defendants argue that "the amended complaint's design defect allegations are futile and do not support any cognizable claim for relief because Plaintiff's lack of any personal injury renders tort-based design defect allegations inapplicable."  (*Id.* at 8.) Defendants recite the elements of a design-defect claim in Minnesota, state that here the "alleged design defect did not cause injury to person or property," and state that various courts "have repeatedly rejected similar 'no-injury' product defect cases where a plaintiff alleges that a product defect could cause physical injury, but instead has caused no harm

other than alleged diminished value of the product itself."[11]   (*Id.* at 8-9 (quoting *Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 623 n.3 (Minn. 1984), for design defect elements).) But, again, Sadeghi-A seeks to add claims for common law fraud, violation of Minnesota's Deceptive Trade Practices Act, and punitive damages, and nowhere refers to a "design defect" or a claim styled as such.  Though some of the facts and legal issues in this case may be similar to those in a design defect case, the Court will evaluate the claims as they are alleged.

In sum, the Court does not agree that Sadeghi-A's "new design defect allegations" are, in fact, design defect allegations, or that these allegations "seek to shoe-horn strict liability and negligence standards into a breach of warranty case."  (Dkt. 40 at 11.)  The

---

[11]   The Court considers whether Sadeghi-A has adequately alleged harm with respect to his fraud claim in Section III.B.5.  The Court notes that several of the cases Defendants cite as "'no-injury' product defect cases" (Dkt. 40 at 9-10) are inapposite here because they involve plaintiffs whose products did not manifest the purported defect and/or worked properly and as intended.  *See Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) ("In this case, the Plaintiffs have not alleged that their ABS brakes have malfunctioned or failed. . . . The Plaintiffs' ABS brakes have functioned satisfactorily and at no time have the brakes exhibited a defect."); *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 18, 270 Wis. 2d 146, 159, 677 N.W.2d 233, 240 ("The injury complained of here is diminution in value only—the plaintiffs allege that their motorcycles are worth less than they paid for them.  However, the amended complaint does not allege that the plaintiffs' motorcycles have diminished value because their engines have failed, will fail, or are reasonably certain to fail as a result of the TC-88 cam bearing defect."); *Farsian v. Pfizer, Inc.*, 97 F.3d 508, 509 (11th Cir. 1996) (question certified to Supreme Court of Alabama addressed plaintiff whose implanted heart valve works properly); *Martin v. Ford Motor Co.*, 914 F. Supp. 1449, 1452, 1455 (S.D. Tex. 1996) (plaintiff contended that a warning advising passengers to fasten the lap belt rendered the vehicles unsafe but failed to produce any evidence of injury at summary judgment).  Here, Sadeghi-A has alleged that his Motorcoach has manifested the USB tag axle defect and that the Motorcoach does not operate properly as a result of the defect.  (*See, e.g.*, Dkt. 34-1 at ¶¶ 19, 29, 44, 45.)

Court therefore turns to the question of whether Sadeghi-A has plausibly alleged his

fraud, Minnesota Deceptive Trade Practices, and punitive damages claims.

**B.      Proposed Amended Complaint Count V – Common Law Fraud**

Count V in the Proposed Amended Complaint is for "Common Law Fraud" and

alleges that "Defendants had a duty to disclose the USB tag axle defects" and that

Defendants "did not disclose" or "failed to disclose" information about the defects to

Sadeghi-A, or other customers, at the time of Sadeghi-A's purchase or afterward,

including when Newmar published PIB 458 and when Sadeghi-A presented the

Motorcoach for repair.  (Dkt. 34-1 at ¶¶ 82-87.)  Based on these allegations, and as

confirmed by Sadeghi-A's counsel at the hearing, the Court understands Sadeghi-A's

common law fraud claim to be based on fraudulent nondisclosure rather than affirmative

misrepresentations.  The Court therefore does not address Defendants' argument that the

amendment does not plausibly allege a common law fraud claim for affirmative

fraudulent misrepresentations.[12]

To state a claim for fraudulent nondisclosure, a plaintiff must allege a duty to

disclose, i.e., "that the defendant had a legal or equitable obligation to communicate facts

to a particular person and that person is entitled to the information," as well as the other

---

[12]      For example, Defendants argued that "Noticeably absent from the amended
complaint is any allegation that Plaintiff ever *saw* the magazine article or the YouTube
video, much less that Plaintiff relied upon the alleged misrepresentations contained
therein and was induced to enter into a purchase agreement for his motorhome."  (Dkt. 40
at 15; *see generally id.* at 14-18.)  At the hearing, Sadeghi-A specified that he was not
relying on the *RV Pro* article or YouTube video for his common law fraud claim, but
argued those allegations are relevant to the statutory fraud and deceptive trade practices
claims.

elements of an ordinary fraud claim. *Zimmerschied v. JP Morgan Chase Bank, N.A.*, 49

F. Supp. 3d 583, 595-96 (D. Minn. 2014) (cleaned up).  To state an ordinary fraud claim

under Minnesota law, Sadeghi-A must allege: (1) a false representation by Defendants of

a past or existing material fact susceptible of knowledge; (2) made with knowledge of the

falsity of the representation or made without knowing whether it was true or false;

(3) with the intention to induce Sadeghi-A to act in reliance thereon; (4) that the

representation caused Sadeghi-A to act in reliance thereon; and (5) that Sadeghi-A

suffered pecuniary damages as a result of the reliance.  *Zimmerschied*, 49 F. Supp. 3d at

591 (citing *Valspar Refinish, Inc. v. Gaylord's Inc.*, 764 N.W.2d 359, 368 (Minn. 2009)).

Claims for fraudulent nondisclosure must comply with Rule 9(b)'s particularity

requirements, and some courts have thus concluded that to state a claim for fraudulent

nondisclosure, plaintiffs are generally required to allege as follows:

> (1) the relationship or situation giving rise to the duty to speak, (2) the event
> or events triggering the duty to speak, and/or the general time period over
> which the relationship arose and the fraudulent conduct occurred, (3) the
> general content of the information that was withheld and the reason for its
> materiality, (4) the identity of those under a duty who failed to make such
> disclosures, (5) what those defendant(s) gained by withholding information,
> (6) why plaintiff's reliance on the omission was both reasonable and
> detrimental, and (7) the damages proximately flowing from such reliance.

*Id.* at 596 (citations omitted).

The parties disagree as to whether the fraud claim in the Proposed Amended

Complaint meets the particularity requirements and adequately states a claim for relief.

(*See* Dkt. 35 at 14 (citing *Zimmerschied*, 49 F. Supp. at 596) ("The allegations of the

proposed amended complaint satisfy these particularity requirements in the context of

fraudulent nondisclosure claims"); Dkt. 40 at 18 ("Plaintiff has failed to adequately plead

an actionable claim for fraudulent omission . . . .").)  The Court will address each element

of the fraud claim in turn.

### 1.      Duty to Disclose

With respect to a duty to disclose,

> As a general rule, one party to a transaction has no duty to disclose material
> facts to the other.  However, special circumstances may dictate otherwise.
> For example: (a) One who speaks must say enough to prevent his words from
> misleading the other party; (b) One who has special knowledge of material
> facts to which the other party does not have access may have a duty to
> disclose these facts to the other party; (c) One who stands in a confidential
> or fiduciary relation to the other party to a transaction must disclose material
> facts.

*Zimmerschied*, 49 F. Supp. at 595-96 (brackets omitted) (quoting *Richfield Bank & Trust

Co. v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648, 650 (1976)); *see also Blue Cross &

Blue Shield of N.C. v. Rite Aid Corp.*, No. 20-CV-1731 (ECT/KMM), 2021 WL 465323,

at *11 (D. Minn. Feb. 9, 2021) (quoting *Graphic Comm'cns Loc. 1B Health & Welfare

Fund A v. CVS Caremark Corp.*, 850 N.W.2d 682, 695 (Minn. 2014)).  "These 'examples

. . . are not intended to be exclusive.'"  *Blue Cross & Blue Shield of N.C.*, 2021 WL

465323, at *11 (quoting *Graphic Comm'cns Loc. 1B*, 850 N.W.2d at 695).

### a.      One Who Speaks Must Say Enough to Prevent His Words from Misleading the Other Party

With respect to the first "special circumstance," Sadeghi-A argues, "After Plaintiff

received the unit, Defendants' knowledge of the USB tag axle defects and its misleading

communications as pled in paragraphs 26 through 28 [regarding Newmar's PIB 458],

obligated it to fully and accurately disclose the USB tag axle defects," and "Defendants

continued to mislead Plaintiff by not fully and accurately disclosing the known USB tag

axle defects at each instance of inspection and repair by Defendants' employees and agents at authorized repair facilities." (Dkt. 35 at 8-9.) Defendants argue that "the only specific communication Plaintiff identities [sic] is a Technical Service Bulletin [PIB 458] published by the motorhome manufacturer Newmar *after* Plaintiff had already purchased his motorhome," and further that Sadeghi-A does not allege "who at Freightliner was involved, that the person or persons knew of any alleged falsity or misrepresentation in the Newmar [PIB 458], or that they intended the bulletin to induce detrimental reliance in customers like Plaintiff." (Dkt. 40 at 26-27.)

The Court concludes that Sadeghi-A has adequately alleged a duty to disclose based on the principle that one who speaks must say enough to prevent his words from misleading the other party, but only with respect to the time period after his initial purchase when he was in communication with Defendants and repair service facilities regarding the Motorcoach and when he became aware of Newmar's PIB 458 in November 2016, because Sadeghi-A could not have been misled under this theory until he became aware of "words" attributable to Defendants. *See Zimmerschied*, 49 F. Supp. at 595.

As to Newmar's PIB 458, Sadeghi-A alleges that Newmar published the bulletin "with" Freightliner and that Newmar received the information for the bulletin from Defendants. (Dkt. 34-1 ¶ 26.) He further alleges that the information in the bulletin was "vague and misleading" and that "Defendants knew that the information it provided to Newmar for publication was not complete or accurate because it did not explain the specific defect or condition, it provided deficient and improper instructions that purported

to provide a repair solution when the instructions admittedly did not correct but actually perpetuated the original defective manufacturing process."  (*Id.*; *see also id.* ¶ 27 (alleging that when Newmar's PIB 458 was published, Defendants "knew that the defect could not be repaired since it was being redesigned and replaced, [and] knew that the repair instructions it published did not address the defective condition"); *id.* ¶ 28 (similar).)[13]  When Sadeghi-A became aware of Newmar's PIB 458 in November 2016, "[a]s instructed by the PIB, and unaware of the actual USB tag axle defects, Plaintiff continued to work with Newmar and Defendants to attempt to obtain repair of the drivability problems."  (*Id.* ¶ 36.)  And in Count V of the Proposed Amended Complaint, Sadeghi-A alleges, "Defendants also failed to timely, fully and accurately disclose and misrepresented the specific defective conditions as a vague tag axle alignment concerns [sic] when it provided information to Newmar . . . , including when Plaintiff discovered and relied upon it in and after November 2016."  (*Id.* ¶ 84.)

Similarly, Sadeghi-A alleges that Defendants, through their employees and agents, told him that the problems he was experiencing with the Motorcoach could be fixed or attempted to repair the problems, which misled him into believing that the problems could be fixed when, in fact, they could not, and Defendants knew they could not.  (*See*

---

[13]    Defendants note that Sadeghi-A does not allege "who at Freightliner was involved."  (Dkt. 40 at 27.)  The Proposed Amended Complaint identifies a specific publication and alleges that Defendants supplied the information for that publication. (*See* Dkt. 34-1 ¶¶ 26, 84.)  The Court finds those allegations sufficiently particular.  *See Johnson*, 175 F. Supp. 3d at 1146 ("Contrary to what Bobcat argues, Johnson does identify a specific promotional material: Bobcat's own website.  He also alleges particularized content from the website . . . .  Altogether, these allegations satisfy Johnson's pleading burden.  Bobcat has more than enough information to adequately respond and prepare a defense, which is the critical inquiry under Rule 9(b).").

Dkt. 34-1 ¶¶ 29-35, 37-38, 40-41, 45 (describing various instances of repair attempts by, inspections by, and communications with specific employees of Defendants or specific authorized repair facilities of Defendants which were in communication with Defendants).)  And in Count V of the Proposed Amended Complaint, Sadeghi-A alleges, "Defendants failed to disclose and misrepresented the USB tag axle defects as needing routine alignment maintenance each time it was presented for repair by Plaintiff when Defendants knew it needed a replacement of defective components and were unwilling to repair it," and "Defendants failed to disclose and misrepresented that the USB tag axle defects each time it was returned to Plaintiff after it was presented for repair because the defective condition was not repaired or replaced and the Motorcoach was not aligned to within specification . . . ."  (*Id.* ¶¶ 86-87.)  Defendants argue that "the only specific communication Plaintiff identities [sic] is a Technical Service Bulletin published by the motorhome manufacturer Newmar *after* Plaintiff had already purchased his motorhome" (Dkt. 40 at 26-27), but Sadeghi-A has also identified several communications by employees of Defendants or authorized repair facilities that were in communication with Defendants by date and by name of employee or facility (*see* Dkt. 34-1 ¶¶ 30-32, 36-38, 40-41, 45.  To the extent these statements were made by employees of the authorized repair facilities rather than by employees of Defendants themselves, Defendants have not argued that the statements made by individuals at the authorized repair centers are not attributable to them in connection with this "special circumstance."

These allegations are enough to plausibly allege that Defendants knew that the defects could not be repaired, and generally had more information about the nature of the

defects, but provided only partial and misleading information to Newmar for publication

and to Sadeghi-A during the course of his repair attempts—either directly or through

authorized repair centers—that indeed misled Sadeghi-A into pursuing repairs that would

never work.  Sadeghi-A has sufficiently alleged that Defendants spoke but not enough to

prevent their words from misleading him.  *See In re Target Corp. Customer Data Sec.*

*Breach Litig.*, 64 F. Supp. 3d 1304, 1311 (D. Minn. 2014) ("Plaintiffs contend [for their

negligent-misrepresentation-by-omission claim in data breach case] that Target knew

facts about its ability to repel hackers that Plaintiffs could not have known, and that

Target's public representations regarding its data security practices were misleading.

Target takes issue with Plaintiffs' allegations in this regard, but on a Motion to Dismiss,

the Court must determine only whether the allegations are plausible.  The allegations

meet that plausibility standard, and Plaintiffs have adequately pled a duty of care.");

*Sorchaga v. Ride Auto, LLC*, 893 N.W.2d 360, 370 (Minn. Ct. App. 2017) ("Sufficient

evidence established that Ride Auto knew the truck required substantial engine repairs

beyond replacing a faulty oxygen sensor.  Nevertheless, Ride Auto and its employees

affirmatively represented to Sorchaga that the oxygen sensor was the cause of the check-

engine light.  Ride Auto misled Sorchaga when it failed to disclose the known engine

problems with the truck."), *aff'd*, 909 N.W.2d 550 (Minn. 2018).

> **b.     One Who Has Special Knowledge of Material Facts to Which the Other Party Does Not Have Access May Have a Duty to Disclose These Facts to the Other Party**

With respect to the second "special circumstance" identified by the Minnesota

Supreme Court, Sadeghi-A argues that he "has pled facts showing that Defendants had

knowledge of the 'USB tag axle defects' which were material because they caused the 'drivability problems' that affected vehicle safety" and that he "did not have access to the technical design flaw information, the affect this created in USB tag axle components relationship to each other, the problems this created in manufacturing and the inability to repair it in servicing." (Dkt. 35 at 7-8.) Defendants argue, "This matter is not a rare case in which the specialized-knowledge exception duty to disclose should be extended and applied. Plaintiff has alleged no facts supporting the imposition of a duty to disclose facts regarding a new design or an alleged design defect." (Dkt. 40 at 20.)

The Court concludes that Sadeghi-A has adequately alleged a duty to disclose based on the principle that one who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party. Sadeghi-A's allegations in the Proposed Amended Complaint include many paragraphs describing Defendants' knowledge of a defect in the USB tag axle that was not disclosed to Sadeghi-A or other customers, including that Defendants: "first became aware of the design mechanical basis for the problem causing customer complaints in early August 2015" (Dkt. 34-1 ¶ 13); "[b]y August of 2015, . . . were aware that the USB tag axle design and its manufacturing process was causing USB tag axles to be installed on chassis off-center" (*id.* ¶ 14); "had a meeting at [Freightliner] headquarters in Gafney, S.C., on April 21, 2016, to figure out how to resolve the problem caused by the defective USB tag axle design and manufacturing" (*id.* ¶ 17); and "[b]efore and after August of 2016" received "customer complaints, warranty claims and out-of-warranty 'goodwill' claims related to the USB tag axle defects causing the drivability problems" (*id.* ¶ 22).

Sadeghi-A also alleges that the defects were "hidden material defects" (*id.* ¶ 23; *see also id.* ¶ 82), that he (and other customers) did not have access to the information about the defects (*id.* ¶¶ 24, 25), and that he would not have purchased the Motorcoach and would not have pursued repair if he had known about the USB tag axle defects (*id.* ¶¶ 25, 36, 90).  The allegations adequately allege that Defendants had material knowledge of problems with the USB tag axle and that customers, including Sadeghi-A, did not have access to that information.

Defendants note that the Minnesota Supreme Court has "rarely addressed" this particular theory of fraud and has only applied it in one case.  (Dkt. 40 at 20 (quoting *Graphic Comm'cns Loc. 1B*, 850 N.W.2d 682).)  Defendants also argue that "extending a pre-sale duty to disclose information by Freightliner to unknown potential purchasers of motorhomes that might be equipped with Freightliner chassis is both unrealistic, and unsupported by the law."  (*Id.* at 21 (citing cases).)  The Court has carefully considered Defendants' pre-sale duty arguments, as well as the cases cited by Defendants, and finds that they do not render Plaintiff's common law fraud claim futile at this stage in the proceedings.  The cases Defendants cite regarding a pre-sale duty between a manufacturer and "unknown potential purchasers" find no duty at the summary judgment stage, and, moreover, in several cases, the decision hinged not on the ultimate determination of whether the facts gave rise to a duty to disclose, but rather on a missing prerequisite to that duty, such as defendant's special knowledge or plaintiff's lack of access to the knowledge.  *See In re Minn. Breast Implant Litig.*, 36 F. Supp. 2d 863, 880

(D. Minn. 1998) (summary judgment)[14]; *Driscoll v. Standard Hardware, Inc.*, 785

N.W.2d 805, 813-14 (Minn. Ct. App. 2010) (affirming summary judgment of

misrepresentation by omission claim because drill manufacturer did not have special

knowledge of material facts at the time drill was purchased); *Marvin Lumber & Cedar*

*Co. v. PPG Indus., Inc.*, 223 F.3d 873, 876-78 (8th Cir. 2000) (affirming district court's

grant of summary judgment on contract claim based on statute of limitations where

plaintiff alleged fraudulent concealment of defects, which would toll the statute of

limitations, and concluding that "[a]t all times, Marvin had access to each of the very

facts that establish Marvin's breach of contract action, namely PILT's alleged failure to

prevent rot on Marvin's products" and even where plaintiff "comes closest to alleging

fraudulent concealment by asserting that PPG misled Marvin," defendant had information

of both "positive" and "less favorable" performance of its product, which "are not

evidence of affirmative fraud"); *Taylor Inv. Corp. v. Weil*, 169 F. Supp. 2d 1046, 1065

(D. Minn. 2001) (granting summary judgment on common law and consumer fraud

claims and noting, "[t]he fact that some of his other customers were experiencing

difficulties with StarBuilder and that he personally had concerns about potential lawsuits

. . . are not the types of special knowledge contemplated by the exception").

Indeed, courts in this District have allowed fraudulent concealment claims to go

forward with allegations similar to those here.  *See*, *e.g.*, *Blue Cross & Blue Shield of*

---

[14]    This case does not appear to have considered a "special knowledge of material
facts" duty, as it only discusses "an obligation to disclose arises (1) where one party owes
a fiduciary duty to the other; or (2) where the circumstances are such that failure to
disclose renders misleading statements which have already been made."  *In re Minn.
Breast Implant Litig.*, 36 F. Supp. 2d at 880 (cleaned up).

*N.C.*, 2021 WL 465323, at \*11 (fraudulent concealment plausibly pleaded where plaintiffs alleged "'Rite Aid had special knowledge of material facts, *i.e.*, the accurate, non-inflated U&C prices, which the Plaintiffs did not have'") (citation omitted); *Podpeskar v. Makita U.S.A. Inc.*, 247 F. Supp. 3d 1001, 1011 (D. Minn. 2017) (quoting *Graphic Comm'cns Loc. 1B*, 850 N.W.2d at 698) ("Podpeskar aims for the second exception, and alleges that Makita 'had special knowledge of material facts to which [Podpeskar] and the [c]lass members did not have access, and, therefore, had a duty to disclose these facts to the other party so as to prevent its statements from being misleading.' . . . Here, Podpeskar satisfied [the pleading requirement to allege actual knowledge of fraudulent conduct] by alleging Makita had actual knowledge of its fraudulent conduct.  Specifically, Podpeskar alleged that Makita knew of the batteries' defects and that a buyer could not reasonably learn of the defect until after purchase.  Accepting those allegations as true, Makita was in a superior position to know about the defect in its batteries.  Thus, the Court will deny Makita's motion with regard to Podpeskar's fraud claims based on omissions and nondisclosures.") (citations omitted); *Johnson*, 175 F. Supp. 3d at 1146 ("[T]he Court finds that Johnson's complaint includes allegations sufficient to satisfy the second circumstance: that Bobcat had superior knowledge of material facts to which Johnson did not have access.  Johnson alleges that Bobcat, as the manufacturer, was in 'a superior position to know the true facts about their product [and] . . . to know the actual design of the loader.'  He further alleges that he 'could not reasonably have been expected to learn or discover' the misrepresentations at the time of purchase, in part because of 'the manner in which the customers fill their fuel

tanks.'  These allegations plausibly establish a duty of disclosure.") (citations omitted);

*Cannon Techs., Inc. v. Sensus Metering Sys., Inc.*, 734 F. Supp. 2d 753, 767-68 (D. Minn. 2010) ("Cannon proceeds on the third prong, arguing that 'Sensus fraudulently concealed special knowledge,' namely, the 336 Capacitor was defective as used in the iCon Meter's design and, hence, the meter ultimately would fail.  In the Court's view, this was 'special knowledge" Sensus was obligated to disclose, and which Cannon could not reasonably obtain. . . . *If* a jury were to credit Cannon's version of events, it could conclude that (1) Sensus knew of the problem with the meter in November 2005, (2) Cannon was not aware of the problem and had no avenue to obtain that knowledge, and (3) Sensus failed to disclose the problem before selling additional meters to Cannon.  That is sufficient to support a finding of fraud.") (citations omitted).

Defendants argue that they had no relationship with Sadeghi-A prior to his purchase, and "Freightliner did not sell anything to Plaintiff, and was not a party to his vehicle purchase."  (Dkt. 40 at 20-21.)  But based on the Court's review of the case law, such a lack of a direct relationship does not preclude Sadeghi-A's claim at this stage: a purchaser of a product may make a claim for fraudulent nondisclosure against a designer or manufacturer of the product where the purchaser did not buy directly from the designer or manufacturer.  *See Podpeskar*, 247 F. Supp. 3d at 1004, 1011 (claim by consumer, who purchased drill from a retailer, against designer, manufacturer, marketer, and seller of drills); *Johnson*, 175 F. Supp. 3d at 1135-36, 1146 (claim for fraud by omission by purchaser, who purchased compact skid-steer loader from authorized dealership, against manufacturer); *Block v. Toyota Motor Corp.*, 795 F. Supp. 2d 880, 885, 890 (D. Minn.

2011) (leave to amend complaint granted as to fraudulent concealment claim against defendants who participated in design, manufacture, or sale of vehicle at issue).  The Court therefore concludes that Sadeghi-A has adequately alleged a duty to disclose based on Defendants' special knowledge of material facts about the USB tag axle defects to which Sadeghi-A did not have access.

        c.      **One Who Stands in a Confidential or Fiduciary Relation to the Other Party to a Transaction Must Disclose Material Facts**

With respect to the third "special circumstance" identified by the Minnesota Supreme Court, Sadeghi-A argues that Defendants had a legal and equitable duty to disclose, specifically, "[v]iewed from a purely legal perspective arising under Federal motor vehicle safety statutes and regulations, Defendants had a clear duty to disclose," and "[a]nchored in the bedrock of safety, those obligations are also tethered by equitable taught-lines."  (Dkt. 35 at 9.)  Defendants respond, "Plaintiff has asserted no duty under the first circumstance [of standing in a confidential or fiduciary relationship] and has made no allegations that Plaintiff and Defendants stood in a fiduciary relationship." (Dkt. 40 at 19.)

The Court concludes that Defendants had no duty to Sadeghi-A under this theory, as there is no confidential or fiduciary relationship plausibly alleged between these parties.  First, the Court notes that Sadeghi-A refers to a "legal and equitable duty" (Dkt. 35 at 9), but that is the wording from the general rule that for a fraudulent nondisclosure claim, a plaintiff must allege "that the defendant had a legal or equitable obligation to communicate facts to a particular person," *Zimmerschied*, 49 F. Supp. 3d at 595 (internal quotation marks and citation omitted).  With respect to the third special circumstances

that would create such a "legal or equitable obligation," that of a "confidential or fiduciary relationship," Sadeghi-A has not identified any such relationship.

Still, the Minnesota Supreme Court has stated that the three categories of special circumstances frequently cited in case law "'are not intended to be exclusive.'" *Blue Cross & Blue Shield of N.C.*, 2021 WL 465323, at *11 (quoting *Graphic Comm'cns Loc. 1B*, 850 N.W.2d at 695). Sadeghi-A seems to argue that Defendants' reporting requirements under various federal statutes and regulations create "a clear duty to disclose" and contends that "Defendants' knowledge that the defects related to stability, control and vehicle safety reflect a special or fiduciary relationship of a moral or personal nature because unwitting customers have placed their confidence and trust in a manufacturer's superior position of expertise and knowledge in the design and manufacturing of the components and their represented performance capabilities can be relied upon as ensuring control, stability and safety of the vehicle." (Dkt. 35 at 9-10.) Sadeghi-A has not cited any case where a regulatory reporting requirement created a confidential or fiduciary relationship between a manufacturer and purchasers for purposes of a common law fraud claim under Minnesota law.[15] The Court declines to do so here,

---

[15]     Sadeghi-A cites *In re Porsche Cars North America, Inc.*, 880 F. Supp. 2d 801, 826-27 (S.D. Ohio 2012), for the proposition that "[a] manufacturer who knows that its product is defective and that it affects vehicle safety is obligated to tell the affected customers and federal regulators." (Dkt. 35 at 10.) That case addressed a claim under California Consumer Legal Remedies Act and is not persuasive as to the argument that a regulatory reporting requirement with respect to a governmental agency, assuming one exists, creates a fiduciary or confidential relationship between consumers and a manufacturer with respect to this Minnesota common law fraud claim. *See* 880 F. Supp. 2d at 826.

and finds that Sadeghi-A has not stated a plausible claim for common law fraud based on such a relationship.

* * *

To summarize, the Court concludes that Sadeghi-A has sufficiently alleged a fraudulent nondisclosure claim based on (1) Defendants' obligation to, having spoken, say enough to prevent their words from misleading Sadeghi-A, but only with respect to the time period after Sadeghi-A's initial purchase when he was in communication with Defendants and repair service facilities regarding the Motorcoach and when he became aware of Newmar's PIB 458 in November 2016; and (2) Defendants' special knowledge of material facts about the USB tag axle defects to which Sadeghi-A did not have access. The Court turns to the remaining elements of a fraudulent nondisclosure claim.

### 2.    False Representation and Knowledge of Falsity

Defendants' only argument regarding falsity and knowledge of falsity was that, as of the time the *RV Pro* article and YouTube video were published in December 2014, Defendants could not have known the tag axle was defective because the chassis development and testing was incomplete.  (Dkt. 40 at 17; *see also* Dkt. 34-1 ¶ 11 (alleging USB tag axle broke during testing in January 2015 and further testing revealed malfunctions).)  Defendants made this argument when arguing that Plaintiff could not state a common law claim for affirmative fraudulent misrepresentations and claims under Minn. Stat. §§ 325F.69 and 325D.44.  (Dkt. 40 at 17.)  Plaintiff has stated he is not asserting a common law fraud claim based on affirmative misrepresentations, so the

Court need not address this argument in this context.[16]  Further, Defendants have not

argued that Sadeghi-A did not sufficiently allege that the tag axle was defective, that they

knew of the tag axle defect as of the date of his purchase in August 2016 or when he

sought repair and maintenance of the Motorhome yet failed to disclose it, or that they

knew that the alleged drivability issues resulting from the tag axle defect could not be

cured by alignment.  (*See id*.)  The Court concludes that Sadeghi-A has adequately

alleged that Defendants did not disclose information about the tag axle defect and that

such information was material (*see, e.g.*, Dkt. 34-1 ¶¶ 15, 23-26), as well as that

Defendants knew of the tag axle defect at least as of the date of his purchase of the

Motorhome (*see, e.g.*, Dkt. 34-1 ¶¶ 13-15, 23, 27-29).

### 3.    Intent

Regarding Defendants' intent to induce Sadeghi-A to act in reliance on

Defendants' omissions, Sadeghi-A argues, "The allegations sufficiently plead facts that

establish Defendants did not disclose the USB tag axle defects in order to avoid any lost

sales, including Plaintiff[']s."  (Dkt. 35 at 12.)  Defendants argue that Sadeghi-A does not

allege sufficient facts giving rise to a plausible inference of fraudulent intent in the

context of arguing that he has not adequately alleged a claim for affirmative fraudulent

misrepresentations but do not otherwise specifically address intent.  (*See* Dkt. 40 at 17.)

The Proposed Amended Complaint alleges that "Defendants' true intention for not

disclosing the issue became apparent on April 6, 2016, when" an email from Defendants'

design engineer stated that sales were being lost due to the alignment issues (Dkt. 34-1

---

[16]    The Court addresses this argument in Section III.C.1.

¶ 15); that "Defendants [sic] failure to provide a timely, accurate, full and complete description of the USB tag axle defects on his Motorcoach was intended to and caused Plaintiff to enter into a purchase" (*id.* ¶ 25); that "Defendants' inability or unwillingness to repair the Motorcoach and its refusal to disclose and attempt to cover-up the USB tag axle defects . . . was intended to induce Plaintiff and other customers to accept false repair attempts and to avoid lost sales" (*id.* ¶ 49); and that "Defendants intended to deceive Plaintiff to induce his and others' purchasing of vehicles on which its USB tag axle was installed, to induce payments for routine maintenance and out-of-pocket repair attempts, to avoid its obligation to repair or replace . . . " (*id.* ¶ 89). Mindful that intent "may be alleged generally," though allegations cannot be conclusory, the Court concludes that Sadeghi-A has sufficiently alleged Defendants' intent. *See* Fed. R. Civ. P. 9(b); *Bhatia v. 3M Co.*, 323 F. Supp. 3d 1082, 1095-96 (D. Minn. 2018) (citing *Dunnigan v. Fed. Home Loan Mortg. Corp.*, 184 F. Supp. 3d 726, 740-41 (D. Minn. 2016)) (plaintiffs must allege facts that give rise to a strong inference of fraudulent intent).

### 4.   Reliance

Regarding Defendants' nondisclosure causing Sadeghi-A to act in reliance on defendants' omissions, Sadeghi-A argues, "Plaintiff would not have purchased the Motorcoach or would have purchased one with a different manufacturer's chassis if he had known about the USB tag axle defect." (Dkt. 35 at 13.) Defendants argue, "Plaintiff makes no plausible allegations that Defendants' failure to disclose to him the 'true nature' of the alleged design defect . . . caused Plaintiff to change his position to his detriment," and "Plaintiff's reliance allegations . . . are indistinguishable from his breach

of warranty claims, and do not plausibly alleged actual detrimental reliance and damages." (Dkt. 40 at 27-28.)

With respect to reliance, Sadeghi-A alleges that "Defendants['] failure to provide a timely, accurate, full and complete description of the USB tag axle defects on his Motorcoach . . . caused Plaintiff to enter into a purchase" (Dkt. 34-1 ¶ 25); that "Plaintiff . . . would not have purchased the Motorhome or would have purchased one with a different manufacturer's chassis if he had known about the USB tag axle defects" (*id.*); that "[i]f Defendants had disclosed the USB tag axle defects he would not have engaged in the repair attempts or expended money in doing so and would have immediately returned the vehicle or demanded USB tag axle replacement" (*id.* ¶ 36); that "Plaintiff relied upon Defendants' misrepresentations in accepting their repeated false attempts to repair and continuing to maintain ownership in an attempt to resolve the problem with Defendants" (*id.* ¶ 41); and that "Plaintiff discovered and relied upon [Newmar's PIB 458] in and after November 2016" (*id.* ¶ 84). Additionally, Sadeghi-A alleges:

> Plaintiff reasonably relied upon Defendants' failures to disclose and misrepresentations in purchasing the Motorcoach, in attempting to have it repaired and in continuing to attempt to obtain repair or replacement during the warranty period. Plaintiff would not have purchased the Motorhome or would have purchased a motorhome with a different manufacturer's chassis if the defect had been disclosed and would have demanded replacement of the tag axle or immediately returned it if the defect and not expended money on repair attempts and trying to determine the true problem if the defects and their unrepairability had been disclosed.

(I*d.* ¶ 90.)

"Accepting these allegations as true, [Sadeghi-A] alleged that he relied on statements and omissions suggesting the product was not defective at the time of

purchase," as well as at the times of the repair attempts.  *Podpeskar*, 247 F. Supp. 3d at

1012.  Courts in this District have allowed claims with similar reliance allegations to go

forward.  *See id.* ("[T]he Court finds that Podpeskar sufficiently alleged reliance to move

forward. Podpeskar alleged: he 'reasonably relied upon the statements made by Makita

on the [b]atteries' packaging,'; 'Makita also represented, through its omissions, that the

[b]atteries were free of defects and would function properly,'; and that 'he would not

have purchased the [b]atteries or he would have either negotiated additional warranty

coverage, negotiated a lower price to reflect the risk, or simply avoided the risk altogether

by purchasing a different product' if he had 'known the [b]atteries were defective and

would fail prematurely.'") (citations to complaint omitted); *Block*, 795 F. Supp. 2d at 890

("Plaintiff-Intervenors have pled reliance; they state that Lee would not have bought or

driven the vehicle, and the passengers would not have ridden in the vehicle, had the

Toyota Defendants made disclosures about known defects.").

###   5.   Damages

Regarding Defendants' nondisclosure causing Sadeghi-A to act in reliance on

Defendants' omissions, Sadeghi-A argues, "The allegations sufficiently plead that

Plaintiff purchased the Motorcoach with a defective USB tag axle that causes it to be

valueless or severely diminished in value," and "Defendants' nondisclosure of the USB

tag axle defect and misleading Plaintiff in an attempt to beguile Plaintiff with false repair

attempts has caused Plaintiff to expend money, time and peace of mind he otherwise

would not have."  (Dkt. 35 at 14.)  Defendants argue, "Plaintiff makes no plausible

allegations that Defendants' failure to disclose to him the 'true nature' of the alleged

design defect . . . caused Plaintiff to change his position to his detriment," and "Plaintiff's

reliance allegations . . . are indistinguishable from his breach of warranty claims, and do

not plausibly alleged actual detrimental reliance and damages." (Dkt. 40 at 27-28; *see*

*also id.* at 28 ("The amended complaint provides no detailed or plausible allegations as to

how Defendants' failure to disclose the nature of the alleged design defect and to disclose

a design change introduced in later model vehicles caused Plaintiff any additional or

different pecuniary damage than he otherwise would have experienced absent such

fraud.").)

> With respect to damages, Sadeghi-A alleges,
>
> The Motorhome has been rendered valueless or severely diminished because
> of the USB tag axle defects and other Motorcoach defects. He is unable to
> sell the Motorcoach without disclosing the impaired, dangerous condition.
> Plaintiff has incurred out of pocket expenditures to pay for damages the
> defects caused to other parts of the Motorcoach, expenditures that he has
> been forced to pay and hundreds of hours of his own time in both service
> attempts not covered by warranty and in an attempt to determine what is
> really wrong with his Motorcoach and the USB tag axle and in pursuing
> litigation . . . . Plaintiff has also lost the use for a substantial period of time
> and been substantially inconvenienced and aggravated while cooperating in
> repair attempts and in investigating and litigating the USB tag axle defects,
> as well as, the loss of enjoyment of the Motorcoach and aggravation and
> distress.

(Dkt. 34-1 ¶ 55; *see also id.* ¶ 91 ("As a direct and proximate result of Defendants'

misrepresentations and failure to disclose, Plaintiff has suffered pecuniary damages

including the loss or diminution in value of the Motorhome, out of pocket expenditures

invested into the Motorhome, money expended on damage caused to other parts of the

Motorhome, attempting to obtain repairs, expended on investigating the defects,

expended on litigation, as well as, time invested in all of the above and loss of use, enjoyment, aggravation damages. . . .").).)[17]

Given the Court's conclusion in Section III.A that Minnesota's Economic Loss Doctrine statute does not foreclose damages based on the value of the product in a case such at this, where intentional misrepresentation is alleged, and that Sadeghi-A alleges other damages—out-of-pocket expenses and loss of use and enjoyment—the Court concludes that Sadeghi-A has sufficiently alleged injury caused by Defendants' alleged nondisclosures. *See Dunnigan*, 184 F. Supp. 3d at 740 (citing *Martino-Catt v. E.I. duPont de Nemours & Co.*, 213 F.R.D. 308, 323 (S.D. Iowa 2003)) ("Dunnigan also generally alleges she incurred 'out-of-pocket expenses' as a result of Freddie Mac's misrepresentations. Again, this is enough to survive a motion to dismiss.") (citation to complaint omitted).

In sum, having considered all of the allegations in the Proposed Amended Complaint, the Court concludes that the allegations supporting Count V, "Common Law Fraud," sufficiently state a claim for fraudulent nondisclosure under Minnesota law and Sadeghi-A may amend his complaint accordingly.

---

[17]   Defendants state that Sadeghi-A has suffered no damages beyond the loss of value of the Motorcoach itself. (*See, e.g.*, Dkt. 40 at 8 ("The economic loss doctrine therefore bars Plaintiff from utilizing product defect claims, such as a design defect theory, to recover damages for harm to the product itself."), 11 ("Plaintiff seeks to impose such a duty in the absence of any injury other than alleged diminution in value of the subject chassis itself.").) But Sadeghi-A has clearly alleged that he incurred out-of-pocket expenditures. (Dkt. 34-1 ¶¶ 55, 91.) Even if the Court accepted Defendants' argument, these out-of-pocket costs constitute damages beyond diminution in value.

**C.      Proposed Amended Complaint Count VI – Statutory Fraud Claims**

Count VI in the Proposed Amended Complaint is for "Violations of Minn. Stat. Secs. 325F.69 and 325D.44." (Dkt. 34-1 at 24.) The opening paragraphs of the Proposed Amended Complaint, specifically addressing Minnesota's Consumer Fraud Act ("MCFA"), are unchanged from the original Complaint. (*Compare id.* ¶¶ 93-94, *with* Dkt. 1-1 ¶¶ 41-42.) Paragraph 95 of the Proposed Amended Complaint is worded differently and invokes both Minn. Stat. § 325F.69 and, newly, Chapter 325D, but is fairly similar to paragraph 43 of the original Complaint. (*Compare* Dkt. 34-1 ¶ 95, *with* Dkt. 1-1 ¶ 43.) Paragraph 44 of the original Complaint has been replaced by paragraphs 96 through 98 of the Proposed Amended Complaint. (*Compare* Dkt. 1-1 ¶ 44, *with* Dkt. 34-1 ¶¶ 96-98.)

New paragraphs 96 to 98 allege that: "Defendants intended that Plaintiff and other customers rely upon its misrepresentations as published in RV Pro Magazine and on You Tube and marketing material which . . . causes a likelihood of misunderstanding intended to induce purchasing," and "[t]he represented beneficial attributes . . . were part of the reason Plaintiff purchased a chassis with the USB tag axle"; "Defendants intended that Plaintiff and other customers rely upon its non-disclosure of the USB tag axle defects to induce purchasing, its misleading half-truth PIB 458 and scheme to lull Plaintiff and other customers to accept false repair attempts and pay for false routine maintenance"; and "Defendants have willfully engaged in the false representations and non-disclosure and know that it is deceptive." (Dkt. 34-1 ¶¶ 96-98.) Paragraph 99 of the Proposed Amended Complaint expands on the public benefit allegation in the original Complaint,

adding a reference to "making false representations" (in addition to concealing) and stating that "[t]he false representations remain published and the defective condition of the USB tag axle exists in chassis manufactured with such axle from April of 2015 through March of 2017 which may exceed one thousand vehicles." (*Compare* Dkt. 34-1 ¶ 99, *with* Dkt. 1-1 ¶ 45.) And paragraph 101 of the Proposed Amended Complaint mostly parallels paragraph 46 of the original Complaint in alleging that Sadeghi-A is entitled to damages and injunctive relief, though the former alleges that such relief is based on "violations of Minn. Stat. Secs. 325F.69, 325D.44 and common law," while the latter only invokes Minn. Stat. § 325F.69. (*Compare* Dkt. 34-1 ¶ 101, *with* Dkt. 1-1 ¶ 46.)

Defendants mount a cursory challenge to Sadeghi-A's proposed claims under Minn. Stat. §§ 325F.69 and 325D.44 when arguing the Proposed Amended Complaint does not state a claim for affirmative fraudulent misrepresentations. (Dkt. 40 at 16 ("Plaintiff's proposed amended statutory claims under Minn. Stat. § 325F.69 and § 325D.44 likewise fail for these same deficiencies.").) The Court addresses each statute separately below.

### 1.    Minn. Stat. § 325F.69

The Court first addresses Minn. Stat. § 325F.69, Minnesota's Consumer Fraud Act ("MCFA"). According to the MCFA:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable . . . .

Minn. Stat. § 325F.69, subd. 1; *see also Liberty Mut. Fire Ins. Co. v. Acute Care Chiropractic Clinic P.A.*, 88 F. Supp. 3d 985, 1010-11 (D. Minn. 2015).  The MCFA requires that a plaintiff plead false, deceptive, or misleading conduct by defendants.  *See E-Shops*, 678 F.3d at 665.  "Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."  *Id.* (citing *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010)).  Although the Minnesota Attorney General has primary responsibility for enforcing the MCFA, *see* Minn. Stat. § 8.31, subd. 1, a private party may "bring a civil action" to recover damages from violations of the MCFA, *id.* § 8.31, subd. 3(a).[18]

The Court concludes that Sadeghi-A has sufficiently alleged violations of Minn. Stat. § 325F.69 in the Proposed Amended Complaint and has done so under multiple theories.  First, Sadeghi-A alleges violations of this statute in the original Complaint, and the proposed allegations generally expand on the original allegations, making the existing claim more detailed.  Defendants' only argument specific to this statutory claim is that the "proposed amended statutory claims under Minn. Stat. § 325F.69 and § 325D.44 likewise fail for these same deficiencies" Defendants assert with respect to the common law fraud claim, of failing to sufficiently allege reliance and causation.  (Dkt. 40 at 16.) But it is difficult to understand how Defendants viewed the less-detailed allegations as to

---

[18]     To recover under the private attorney general statute, a plaintiff must additionally demonstrate that their action "benefits the public."  *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000); *Kinetic Co. v. Medtronic, Inc.*, 672 F. Supp. 2d 933, 945 (D. Minn. 2009) (quoting *Ly*, 615 N.W.2d at 314); *see also id.* at 946 ("[T]he 'public benefit' requirement is not onerous.  For example, there is a public benefit in eliminating false or misleading advertising.").  Defendants make no argument that Sadeghi-A has not adequately alleged a public benefit in his claim under Minn. Stat. § 325F.69 (*see generally* Dkt. 40), so the Court does not address this requirement in the context of the Motion to Amend.

Minn. Stat. § 325F.69 in the original Complaint as unworthy of a Rule 12 challenge but now view these more detailed—indeed, more particular—allegations as insufficient under a Rule 12 standard.

Second, the Court has concluded in Section III.B that the Proposed Amended Complaint's common law fraudulent nondisclosure allegations are sufficient. For the same reasons, the allegations in the Proposed Amended Complaint are sufficient for a fraudulent nondisclosure claim pursuant to Minn. Stat. § 325F.69.

Third, "[a] violation of sections 325G.17 to 325G.20 shall be treated as a violation of section 325F.69." Minn. Stat. § 325G.20. Sadeghi-A alleges that Defendants violated those sections 325G.17 to 325G.20 in Count IV in both the original and Proposed Amended Complaint and that such a violation is also a violation of § 325F.69. (*See* Dkt. 34-1 ¶ 93 ("Defendants' violation of Minn. Stat. Secs. 325G.17-.20, as a matter of law shall be also be [sic] treated as a violation of Minn. Stat. Sec. 325F.69, Minnesota's Consumer Fraud Act."); Dkt. 1-1 ¶ 41 (same).) Defendants did not challenge the sufficiency of the allegations supporting Count IV for violation of Minn. Stat. §§ 325G.17-20 in the original Complaint or Proposed Amended Complaint. This, along with Defendants' failure to challenge Plaintiff's claim under Minn. Stat. § 325F.69 in the original Complaint, undermines the strength of Defendants' current challenge to the proposed claim under Minn. Stat. § 325F.69.

Fourth, in addition to the fraudulent nondisclosure allegations, Sadeghi-A also alleges affirmative misrepresentations in support of his statutory fraud claims and specifically stated at the hearing that the allegations related to the *RV Pro* article and

YouTube video are in support of the statutory claims.  (*See* Dkt. 34-1 ¶ 96.)  The Court concludes that this theory also sufficiently alleges a claim for violation of Minn. Stat. § 325F.69.  The allegations related to the *RV Pro* article and YouTube video sufficiently allege the who, what, where, when, and how:  the who are the individuals at Defendants who supplied information for or worked on the article and video (as with Newmar's PIB 458, discussed *supra* at note 13, the identification of a specific article and video sufficiently puts Defendants on notice of whose conduct is at issue); the what is the representations in the article and video about the performance of the USB tag axle; the where is wherever those individuals were working at that time (which, again, is information in Defendants' possession and which the allegations allow them to investigate); the when is both the time period of providing information and working on the article and video and, later, the time period of potential customers viewing the purported misrepresentations; and the how is by supplying the information that is represented in the article and video, which Sadeghi-A alleges was false or constituted misrepresentations.  (*See* Dkt. 34-1 ¶¶ 10, 96.)

Defendants argue that the allegations with respect to affirmative misrepresentations do not sufficiently allege reliance and causation.  (Dkt. 40 at 16.) However, as Sadeghi-A noted at the hearing, the holding in the case Defendants cite on this point, *Thompson v. American Tobacco Co., Inc.*, 189 F.R.D. 544, 552-53 (D. Minn. 1999), was later rejected by the Minnesota Supreme Court in *Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, (Minn. 2001).  In *Group Health Plan*, the Minnesota Supreme Court concluded "that the legislature has eliminated the requirement of pleading

and proving traditional common law reliance as an element of a statutory

misrepresentation in sales action" and that although "causation is a necessary element in

a damages claim under the misrepresentation in sales statutes," the language of Minn.

Stat. § 8.31, subd. 3a, does not "require a strict showing of direct causation, as would be

required at common law," but rather "some 'legal nexus' between the injury and the

defendants' wrongful conduct."[19]  621 N.W.2d at 13-15 (rejecting "the view expressed in

two federal court decisions [including *Thompson*] that our misrepresentation in sales laws

require proof of individual reliance in all actions seeking damages").  Here, Sadeghi-A's

allegations that Defendants knowingly made false representations in the *RV Pro* article

and YouTube video—and those "false representations remain published" (Dkt. 34-1

¶ 99)—and intended that Sadeghi-A and other customers rely on the article and video,

and that the "represented beneficial attributes" were part of the reason Sadeghi-A himself

purchased the Motorcoach with the USB tag axle, are enough to plausibly allege a

violation of Minn. Stat. § 325F.69 based on affirmative misrepresentations (*see id.* ¶¶ 10,

96, 98, 99).

Defendants also argue that an affirmative misrepresentation claim under this

statute is futile because Defendants did not know the tag axle was defective until at least

---

[19]     Since then, at least one court in this District has recognized the Minnesota
Supreme Court's rejection of *Thompson*.  *See, e.g.*, *Luckey v. Alside, Inc.*, 245 F. Supp.
3d 1080, 1096 (D. Minn. 2017) ("The Minnesota Supreme Court clarified, in *Group
Health Plan*, that a plaintiff ultimately must prove 'causation,' or a 'legal nexus' between
the offending conduct and the plaintiff's damages, but that personal reliance by the
plaintiff is not the only way to demonstrate the requisite legal nexus.  To the extent
Alside argues that Plaintiffs must have personally perceived and relied on Alside's
alleged misrepresentations in order to state a claim under these statutes, the Court rejects
this argument.") (citations omitted).

January 2015, after the *RV Pro* article and YouTube video were published in December 2014. (Dkt. 40 at 17.) However, Sadeghi-A alleges that "Defendants intended that Plaintiff and other customers rely upon its misrepresentations as published in RV Pro Magazine and on You Tube and marketing material" (Dkt. 34-1 ¶ 96) and that "[t]he false representations remain published and the defective condition of the USB tag axle exists in" certain vehicles (*id.* ¶ 99). Under these circumstances, the Court finds that the continued availability of the YouTube video, which could have been removed after Defendants learned of the tag axle defect, plausibly alleges that Defendants knew the representations in that video were false during its post-January 2015 availability.

### 2. Minn. Stat. § 325D.44

Sadeghi-A also seeks to amend to add violations of Minn. Stat. § 325D.44, Minnesota's Deceptive Trade Practices Act ("MDTPA"), to Count VI of the Proposed Amended Complaint. (*See* Dkt. 34-1 at 24.) MDTPA describes conduct that constitutes deceptive trade practices, including "caus[ing] likelihood of confusion or of misunderstanding as to . . . certification of goods or services," "represent[ing] that goods or services have . . . characteristics, . . . , uses, benefits, or quantities that they do not have," and "any other conduct which similarly creates a likelihood of confusion or misunderstanding." Minn. Stat. § 325D.44, subd. 1(2), (5), (13). Like the MCFA, the MDTPA requires that a plaintiff plead false, deceptive, or misleading conduct by defendants, and Rule 9(b)'s heightened pleading requirement applies. *See E-Shops*, 678 F.3d at 665. Unlike the MCFA, the MDTPA itself creates a cause of action for

consumers "likely to be damaged by a deceptive trade practice of another." *See* Minn. Stat. § 325D.45, subd. 1.[20]

Defendants' arguments with respect to Minn. Stat. § 325D.44 are the same as those with respect to Minn. Stat. § 325F.69. (Dkt. 40 at 16.) Those arguments fail for the same reasons as stated above for Minn. Stat. § 325F.69.

* * *

In sum, having considered all of the allegations in the Proposed Amended Complaint, the Court concludes that the allegations supporting Count VI, "Violations of Minn. Stat. Secs. 325F.69 and 325D.44," sufficiently state a claim, and Sadeghi-A may amend his complaint accordingly.

## D.    Proposed Amended Complaint Count VII – Punitive Damages

The final issue in the Motion to Amend is Sadeghi-A's request to add a claim for punitive damages under Minn. Stat. § 549.20. Although Minnesota law prohibits a party from pleading a claim for punitive damages at the commencement of a lawsuit and provides a specific mechanism for amending the complaint in Minn. Stat. § 549.191, this Court has previously examined whether Rule 15 or Minn. Stat. § 549.191 applies to a motion to amend a complaint to include punitive damages and concluded that Rule 15

---

[20]    "Relief is available under the MDTPA only to prevent future harm, not to compensate for past harm . . . ." *Anderson v. 1399557 Ontario Ltd.*, No. 18-CV-1672 (PJS/LIB), 2019 WL 5693749, at *12 (D. Minn. Nov. 4, 2019); *see also Johnson*, 175 F. Supp. 3d at 1140 ("The sole statutory remedy for Johnson's MDTPA claim is injunctive relief.") (cleaned up). Defendants make no argument as to whether Sadeghi-A has adequately alleged that he or anyone else is likely to suffer harm in the future (*see generally* Dkt. 40), so the Court does not address this requirement in the context of the Motion to Amend.

governs. *Dolphin Kickboxing Co. v. Franchoice, Inc.*, 335 F.R.D. 393, 397-401 (D. Minn. 2020) (discussing that courts in the District of Minnesota "have historically applied the state statute, Minn. Stat. § 549.191, rather than Rule 15, to motions to amend to add a claim for punitive damages, in diversity actions," but "have recently taken another look at the practice . . . in view of the 2010 United States Supreme Court's decision in *Shady Grove Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)," and concluding that Rule 15 should apply). The Court therefore applies the standard articulated in Section II.

The relevant legal basis for punitive damages under Minnesota law provides:

(a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.

(b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

(1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

(2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Minn. Stat. § 549.20, subd. 1. Under these criteria, "[a] defendant operates with 'deliberate disregard' by acting with intent or indifference to threaten the rights or safety of others." *Gamma-10 Plastics, Inc. v. Am. President Lines, Ltd.*, 32 F.3d 1244, 1255 (8th Cir. 1994). As such, "the mere existence of negligence or of gross negligence does not rise to the level of willful indifference so as to warrant a claim for punitive

damages."[21]  *Ulrich v. City of Crosby*, 848 F. Supp. 861, 868 (D. Minn. 1994) (citations

omitted); *see also  Shank v. Carleton College*, 16-CV-1154 (PJS/HB), 2018 WL

4961472, at *7 (D. Minn. Oct. 15, 2018) (same), *aff'd*, 329 F.R.D. 610 (D. Minn. 2019);

*Berczyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, 1008 (D. Minn. 2003) ("A mere

showing of negligence is not sufficient to sustain a claim of punitive damages.") (cleaned

up).  Moreover, plaintiffs must allege that defendants were aware of a high probability

that their conduct would cause injury to plaintiffs.  *See In re McNeilus Mfg. Explosion

Coordinated Litig.*, No. 17-CV-5237-PJS-KMM, 2019 WL 2387110, at *4 (D. Minn.

June 6, 2019).  Put another way, the Court looks to whether the allegations in a proposed

amended complaint plausibly allege that defendants knew of facts, or intentionally

disregarded facts, that created a high probability that defendants' actions would harm the

rights or safety of plaintiffs.

Sadeghi-A argues that "Defendants' conduct shows that they acted with

intentional disregard of the high degree of probability of injury to the rights or safety of

Plaintiff and other customers" and that the Proposed Amended Complaint "alleges facts

which plausibly establish this claim."  (Dkt. 35 at 16-17.)  Defendants argue that the

amendment is futile because, first, "the amended complaint's fraud allegations do not

state a plausible claim, and . . . [t]he proposed punitive damages claim amendment should

therefore be denied as well, given the absence of a viable independent tort claim," and,

---

[21]    "Minnesota law defines gross negligence as 'without even scant care but not with
such reckless disregard of probable consequences as is equivalent to a willful and
intentional wrong.'"  *Greer v. Walsh Constr. Co.*, No. CV 15-465 (PAM/JSM), 2016 WL
6892109, at *8 (D. Minn. Feb. 23, 2016) (quoting *State v. Chambers*, 589 N.W.2d 466,
478 (Minn. 1999)).

56

second, that Sadeghi-A "has not pleaded plausible facts that could meet the substantive requirements of the Minnesota punitive damages statute." (Dkt. 40 at 30-31.) The first argument is unpersuasive, given the Court's conclusion that Sadeghi-A may amend the Complaint to include the common law fraud claim. *See Dolphin Kickboxing*, 335 F.R.D. at 403 (collecting cases) ("[C]ourts have concluded that [punitive] damages are appropriate in the context of fraud.").

As for Defendants' second argument, Defendants specifically argue that the facts alleged, "even taken as true, do not elevate this matter beyond an ordinary breach of warranty case," and that "[a]lthough Plaintiff attempts to enhance the seriousness of these allegations by asserting that the defect poses a *potential* safety hazard, Plaintiff has alleged no personal injury or actual harm to himself or any other person as a result of the alleged defect." (*Id.* at 31.)

The Court concludes that Sadeghi-A has plausibly alleged a claim for punitive damages. As the Court has discussed with respect to the fraud claims, the Proposed Amended Complaint sufficiently alleges that Defendants had knowledge of facts about problems with the USB tag axle, including the effects the USB tag axle had on the operation of the vehicle, and either made misrepresentations or concealed those facts. (*See* Dkt. 34-1 ¶ 103.) And the proposed allegations sufficiently allege that those facts "create a high probability of injury to the rights or safety of others." Minn. Stat. § 549.20, subd. 1(b). Freightliner's own employee stated that there was a safety issue. (Dkt. 34-1 ¶ 20.) The Proposed Amended Complaint alleges that the USB tag axle creates various "drivability problems," including alignment problems, resulting in

damage to the Motorcoach, and it is alleged that such problems create safety risks.  (*See, e.g.*, *id.* ¶¶ 12-15, 19, 45-46, 48, 54, 104-05.)  And it is alleged that Defendants proceeded to act despite, or in conscious or intentional disregard of, their knowledge of the safety risks and the damage the defective tag axle could cause, by continuing to sell motorcoaches with the USB tag axle for a period of time and by not disclosing the defects to consumers, including Sadeghi-A.  (*See, e.g.*, *id.* ¶¶ 15, 24, 28, 29, 43, 104-07, 109.)  Assuming as true the allegations that Defendants knowingly made the misrepresentations and/or fraudulently concealed facts, when construed in the light most favorable to Sadeghi-A, these allegations set forth a plausible claim that Defendants consciously or with deliberate indifference (1) provided Sadeghi-A and other customers with inaccurate information about the USB tag axle, and/or (2) withheld accurate information about the USB tag axle from Sadeghi-A and other customers, in order to entice them into purchasing and keeping motorhomes with the USB tag axle, thereby creating a high probability that Defendants' actions would harm Sadeghi-A and other customers' rights with respect to their purchase and/or safety when operating the Motorcoach (in addition to the safety of others on the road with affected motorhomes).

Defendants argue, again, that this case is only a breach of warranty case.  (Dkt. 40 at 31 ("All of these facts, even taken as true, do not elevate this matter beyond an ordinary breach of warranty case."); *id.* at 32 ("If punitive damages are permitted under these allegations, nearly every consumer product manufacturer could be subjected to punitive damages claims in ordinary breach of warranty cases each time a product design improvement is made.").)  These statements are unpersuasive, as they ignore that if the

Court allows amendment to add a common law fraud claim—which it now has—the case

is not just an "ordinary breach of warranty case."  Defendants also contend that Sadeghi-

A has not alleged that he or anyone else has actually been harmed.  (Dkt. 40 at 31-32.)

Defendants do not cite any case where actual harm is required, and in *Jensen v. Walsh*,

the Minnesota Supreme Court explained:

> Without punitive damages, one who acts with deliberate disregard of the
> rights or safety of others faces no greater penalty than a well-meaning but
> negligent offender.  It is therefore appropriate, in determining whether
> punitive damages should be allowed, to focus on the wrongdoer's conduct
> rather than to focus on the type of damage that results from the conduct.

623 N.W.2d 247, 251 (Minn. 2001).  "A plain reading of section 549.20 indicates that the

legislature intended to allow punitive damages when there is clear and convincing

evidence that a defendant acted with deliberate disregard for the rights *or* safety of others

regardless of the nature of the resulting damage."  *Id.*

> Here, Sadeghi-A alleged a disregard to the safety of others because:

> Defendants have known since 2015, that the USB tag axle defects create a
> high degree of probability that Plaintiff and other customers whose safety
> could be injured because of the USB tag axle defects that could not be
> repaired and that caused the drivability problems that affect safety, and
> Defendants deliberately proceeded to not disclose and misrepresent the USB
> tag axle defects in conscious and intentional disregard or indifference of a
> high degree of probability of injury to Plaintiff's and others' safety.

(Dkt. 34-1 ¶ 105.)  He further alleged actual harm to property rights in the form of "out-

of-pocket expenses on repair attempts and damages related to other parts of the

Motorcoach and other expenses or losses to the detriment of their property rights" (*id.*

¶ 106), that the Motorcoach's tires were destroyed due to the tag axle issues (*id.* ¶ 48),

and a traction control failure attributable to "steering/alignment," which he attributes to

59

the tag axle defect (*id.* ¶¶ 45-46, 48).  In view of these allegations, the Court finds the
absence of any allegation of actual physical injury to Sadeghi-A or another person does
not render his punitive damages claim futile.

The cases Defendants cite are factually distinguishable.  (*See* Dkt. 40 at 32.)  In *In
re Bair Hugger Forced Air Warming Devices Products Liability Litigation*, No.
MDL152666JNEFLN, 2017 WL 5187832 (D. Minn. July 27, 2017), it appears that the
plaintiffs made only conclusory allegations that the defendants had the knowledge of the
relevant facts required by Minn. Stat. § 549.20, subd. 1(b).  2017 WL 5187832, at *7
("[T]he Court is not bound to accept the conclusory statement that Defendants had
*knowledge* of bacterial contamination or that there was a patient safety risk, nor is it
bound to accept that Defendants *willfully suppressed* potentially harmful testing.
Knowledge is an element of the cause of action, and Plaintiffs' conclusory allegation that
Defendants' had the requisite *knowledge*, is a threadbare recital of the knowledge element
of the statute.").  Here, Sadeghi-A's allegations about Defendants' knowledge of the
defect in the USB tag axle, and the alignment and other problems caused by the defect, as
well as the safety risk posed by those problems, are more than conclusory: he has alleged
specific statements by or to employees of Defendants, with dates, that demonstrate
knowledge of the defect in the USB tag axle and its effect on vehicles and safety.  (*See,
e.g.*, Dkt. 34-1 ¶ 12-15, 20, 103-07.)  The *In re Bair Hugger* court also concluded that
"[t]he arguments that Defendants secretly reduced the Bair Hugger filtration efficiency
and failed to conduct a contamination study, does not allege factual content that allows
the Court to draw a reasonable inference that Defendants are liable for knowing of or

intentionally disregarding facts that make injury highly probable," but instead "alleges

only that Defendants may have been negligent."  2017 WL 5187832, at *8.  This

conclusion once again points to the lack of factual allegations supporting an inference of

knowledge on the part of defendants about a problem with the product or safety risks, or

even of the existence of the problem itself.  *See id.* (allegations "do not permit a

factfinder to infer that this filtration reduction resulted in an increased risk of surgical site

infections or that Defendants knew that this risk could result from reducing the

filtration").  Sadeghi-A has pleaded non-conclusory factual allegations that problems

with the USB tag axle existed, that Defendants knew about those problems, and that

Defendants knew those problems had safety implications.

    And in *Rogers v. Mentor Corp.*, No. 12-CV-2602 (SRN/SER), 2018 WL 2215519

(D. Minn. May 15, 2018), the court allowed the amendment to add a claim for punitive

damages in part because as of "a watershed moment," when a physician terminated his

consulting agreement with Mentor because he could no longer support the product,

"Mentor knew of facts that created a high probability of injury to others and that

continuing to sell and market ObTape despite knowing those facts constitutes a deliberate

disregard for others' rights or safety."  2018 WL 2215519, at *12, *aff'd sub nom. Urbieta*

*v. Mentor Corp.*, No. CV 13-1927 ADM/LIB, 2018 WL 3475484 (D. Minn. July 19,

2018).  Here, the allegations in the Proposed Amended Complaint include an analogous

watershed moment as of at least November 2, 2016, when Freightliner engineer

Traynham, who himself "designed the USB tag axle integration to the chassis," stated

that there was a safety issue with the USB tag axle.  (Dkt. 34-1 ¶ 20.)  The Court will not

limit an amendment for punitive damages to only after this date, however, as the *Rogers* court did, because there are sufficient allegations in the Proposed Amended Complaint that plausibly allege that the relevant moment—when Defendants acquired the requisite knowledge of "facts that create a high probability of injury to the rights or safety," Minn. Stat. § 549.20, subd. 1(b)—was earlier.  (*See* Dkt. 34-1 ¶ 13 ("Defendants apparently first became aware of the design mechanical basis for the problem causing customer complaints in early August 2015."), ¶ 15 (April 6, 2016 communications suggesting the problem was known—"the tag alignment issue"—and so far unsolved), ¶¶ 17-18 (Defendants redesigned the USB tag axle from at least April 2016 to October 2016), ¶ 109 ("The misconduct and any concealment of it has persisted since August of 2015 . . . .").)  At this stage of the case, with these allegations, it is premature to decide the exact date on which Defendants' knowledge met the standard of Minn. Stat. § 549.20, subd. 1(b).

In sum, the Motion to Amend is granted with respect to punitive damages.

## IV.  ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.  Plaintiff Ardalan Sadeghi-A's Amended Motion for Leave to Amend Complaint (Dkt. 34) is **GRANTED**.

2.  Plaintiff shall file his Amended Complaint on **March 23, 2021**, unless an appeal of this Order is sought.

3.      Defendants shall respond to the Amended Complaint in a manner consistent

with the Federal Rules of Civil Procedure.


DATED:  March 8, 2021                          *s/Elizabeth Cowan Wright*
                                               ELIZABETH COWAN WRIGHT
                                               United States Magistrate Judge