**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Ardalan Sadeghi-A,

               Plaintiff,

v.                        **MEMORANDUM OF LAW & ORDER**
                              Civil File No. 19-2373 (MJD/ECW)

Daimler Trucks North America LLC
and Freightliner Custom Chassis
Corporation,

               Defendants.

---

Joseph S. Lawder, Lawder Law, PLLC, and Patrick R. Burns, Burns Law Firm PLLC, Counsel for Plaintiff.

Christine M. Mennen and David J. Warden, Nilan Johnson Lewis PA, Counsel for Defendants.

---

## I.      INTRODUCTION

This matter is before the Court on Defendants' Motion for Partial Summary Judgment.  [Docket No. 88]  The Court will decide the matter on the papers.

## II.     BACKGROUND

### A.     Factual Background

### 1.   Plaintiff's Purchase of the Motorhome

On August 1, 2016, Plaintiff Ardalan Sadeghi-A purchased and took delivery of a new luxury/highline 2017 Newmar London Air motorhome from Steinbring Motorcoach ("Steinbring") in Garfield, Minnesota.  (Am. Compl. ¶ 5; Sadeghi-A Decl. ¶ 9; Warden Decl., Ex. 5, Sadeghi-A Dep. 58 86.)  Defendants Daimler Trucks North America LLC ("Daimler") and Freightliner Custom Chassis Corporation ("Freightliner") designed and manufactured the chassis and related components of the motorhome, including the axles, that were then delivered to Newmar Corporation ("Newmar"), which manufactured the completed motorhome.  (Am. Compl. ¶ 7.)  Newmar was the body builder of the motorhome and performed a final vehicle alignment after the body was added to the chassis.  (Warden Decl., Ex. 1, Rostenbach Dep. 38; Warden Decl., Ex. 2, Panceroff Dep. 210-11.)  The motorhome had a passive steer tag axle, a non-driven, continuous weight-bearing axle that allows the motorhome to carry more weight but does not have direct steering input.  ([Docket No. 48] Mar. 8, 2021, Order at 2 n.3)

### 2.   Pre-Purchase Events

Before Plaintiff purchased the motorhome, he spoke with numerous dealers, but he does not recall if he spoke with representatives of Defendants about the chassis.  (Sadeghi-A Dep. 67-69.)  Plaintiff looked at Freightliner's website to compare its chassis and axle design to that of competitor Spartan Motors Chassis, Inc. ("Spartan").  (Id.; Sadeghi-A Decl. ¶ 6.)  Plaintiff viewed Freightliner's advertising video and heard about a tighter turning radius, more precise steering, reduced tire wear, greater stability, handling and carrying capacity, improved safety, and reduced maintenance costs.  (Sadeghi-A Decl. ¶ 6.)  The video marketing advertisement and the printed brochure were important factors in Plaintiff's decision to purchase a Freightliner chassis with the passive steer tag axle instead of a Spartan chassis.  (Id.)  Plaintiff does not recall the specifics of the content that he viewed on Freightliner's website apart from a video that discussed the functionality of the tag axle.  (Sadeghi-A Dep. 71-72.)

Plaintiff avers that, because there were no Newmar dealers in Ohio authorized to sell luxury line models, Plaintiff decided to work with Steinbring in Minnesota and custom ordered a 2017 London Aire in April of 2016.  (Sadeghi-A Decl. ¶ 7.)

### 3.   Defendants' Warranty

With Plaintiff's purchase of the motorhome, Defendants provided an

express warranty entitled New Vehicle Limited Warranty ("Warranty").  (Am

Compl., Ex. B, Warranty at 19; Warden Decl., Exs. 3-4.)  The relevant Warranty

language provides:

> Under this New Vehicle Limited Warranty ("Warranty"), Daimler
> Trucks North America LLC ("Company") warrants that each new
> vehicle will be free from defects in material and workmanship that
> occur under normal use within the applicable warranty period,
> subject to certain limitations and exclusions as specified in this
> document.
>
> This limited warranty applies only to new vehicles sold by an
> authorized Daimler Trucks North America (DTNA) dealer or
> ordered directly from DTNA; vehicles sold at auction or as a result
> of repossession retain the warranty coverage from the original in-
> service date or factory invoice date if the vehicle has not been
> warranty registered.
>
> Daimler Trucks North America LLC reserves the right to reduce or
> remove coverage on vehicles in salvage condition.
>
> This Warranty covers all components and parts unless specifically
> covered by other warranties or otherwise excluded by this
> document.

(Am. Compl., Ex. B, Warranty at 19.)  The Warranty provides that the "Basic

Chassis" is warranted for a period of period of 3 years or 50,000 miles, whichever

occurs first.   (Id. at 3.)

The Warranty excludes the axle, wheel, and steering wheel alignments:

Each Daimler Trucks North America vehicle manufacturing plant uses an integrated alignment system to align axles and wheels and to center the steering wheel to Daimler Trucks North America LLC specifications. Realignment or readjustment of these items, including steering stops and steering poppets, is not covered under warranty.

Any special alignment settings at the request of the Owner must be handled between the Dealer and Owner after delivery from factory. These special adjustments are not covered under Warranty.

(Warranty at 22.) The Warranty also provides: "The tires are not covered under this Warranty, but are warranted separately by the tire manufacturer. Tire balancing is not covered under warranty." (Warden Decl., Ex. 3.)

The Warranty provides that it is the purchaser's

SOLE AND EXCLUSIVE REMEDY AGAINST COMPANY, WHETHER IN CONTRACT, UNDER STATUTE (INCLUDING STATUTORY PROVISIONS AS TO CONDITIONS AS TO QUALITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF GOODS SUPPLIED PURSUANT TO THE CONTRACT OF SALE), WARRANTY, TORT, STRICT LIABILITY, OR ANY OTHER LEGAL THEORY.

(Warranty at 21.) The Warranty further limits Defendants' liability under the Warranty:

TO THE COST TO REPAIR OR REPLACE, IN COMPANY'S SOLE DISCRETION, THE DEFECTIVE COMPONENT OR PART THAT

IN NO EVENT SHALL EXCEED THE FAIR MARKET VALUE OF
THE VEHICLE AT THE TIME THE DEFECT IS DISCOVERED.

IN NO EVENT SHALL COMPANY BE LIABLE FOR SPECIAL,
INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES
INCLUDING, BUT NOT LIMITED TO, INJURIES TO PERSONS OR
DAMAGE TO PROPERTY, LOSS OR PROFITS OR ANTICIPATED
PROFITS, OR LOSS OF VEHICLE USE.

(Id.)

### 4.     Problems with Plaintiff's Motorhome

#### a)     Immediate Issues with Pulling

According to Plaintiff, as someone who had owned motorhomes since the

mid-1990s, he quickly realized that there was something wrong with the way the

motorhome drove because it was pulling.  (Sadeghi-A Decl. ¶¶ 2-4, 10.)  While

still in Minnesota leaving the dealership, Plaintiff experienced hard pulling that

required constant counteractive steering.  (Id. ¶ 10.)  Within two hours of leaving

the dealership, Plaintiff called Newmar to advise it of the pulling issue and

request an alignment inspection, and Newmar directed him to contact

Freightliner; he told both companies that the motorhome was pulling and

bouncing or vibrating.  (Id.)

#### b)     The PIB

6

One week later, on August 9, 2016, Newmar published Product

Information Bulletin ("PIB") 458.  (Lawder Decl., Ex. G, Hermann Dep. 42-43, 51-

52, 67-68, 90-92; Lawder Decl., Ex. G2, PIB 458.)  The PIB was created because, a

few weeks earlier, Freightliner had contacted Newmar and informed Newmar

that there was a possibility that some chassis were having issues with the rear

axle being out of alignment.  (Hermann Dep. 43, 51.)  The PIB stated:

> Some Newmar 2016 coaches with the models listed above may
> exemplify a tag axle out of alignment.  Upon verification of a tag
> axle alignment concern, please contact Newmar Dealer Service [].
> Newmar will contact Freightliner to assist in the resolution.

(PIB 458.)  Attached were alignment instructions and a list of the possibly

affected vehicles by VIN number.  (Id.)  Plaintiff's motorhome was not listed.

Freightliner provided alignment instructions from April 2015 that purported to

provide a repair solution even though the alignment instructions had already

been re-written on June 22, 2016.  (Hermann Dep. 86-91; PIB 458; Lawder Decl.,

Ex. F40.)  At the time PIB 458 was published, Freightliner had had concerns for at

least one year that a tag axle alignment issue was caused by errors in installation

of the USB tag axle caused by its defective design.  (Lawder Decl., Exs. A45-A49;

Ex. F41.)

c)      **2016 Repair Attempts**

7

From August through December 2016, Plaintiff made at least 5 different attempts to have the pulling issue repaired.  (Sadeghi-A Decl. ¶¶ 11-27.)  Plaintiff communicated directly to Freightliner regarding the drivability problems and was instructed to bring the motorhome to an authorized service facility or meet with Freightliner employees.  (Id.)  At no time during this period, did Defendants or their authorized service facilities disclose a USB tag axle design defect, the misinstallation it caused on his motorhome, that there was no effective repair, or that the slotted component was being redesigned.  (Id. ¶ 27.)

In one instance, on August 22, 2016, Plaintiff met with Freightliner's factory service manager, David Hoover, at the Newmar facility.  (Sadeghi-A Decl. ¶ 13.)  Hoover inspected the tag tires and told Plaintiff: "We'll take care of this."  (Id.)  At Newmar and Hoover's direction, Plaintiff took the motorhome to Monteith's Tire and Auto Center in Goshen, Indiana, for an alignment, that afternoon.  (Id. ¶ 14; Warden Decl. Ex. 7.)  On August 24, at Newmar's direction, Plaintiff took the motorhome to Glenn's Tire, which replaced the tag axle tires at Freightliner's expense.  (Sadeghi-A Decl. ¶ 14; Warden Decl., Ex. 5, Sadeghi-A Dep. 176-78.)

### d)    2017 Repair Attempts

8

On January 14, 2017, Plaintiff sent a letter to the CEOs of Daimler and Freightliner and their legal counsel demanding that they take back his motorhome as defective due to the tag axle problems. (Sadeghi-A Decl. ¶ 29; Sadeghi-A Decl., Ex. QQ.) The parties negotiated, and Defendants offered to repurchase Plaintiff's motorhome under certain conditions. (Sadeghi-A Decl. ¶¶ 29-30; Sadeghi-A Decl., Ex. SS.) Due to Plaintiff's concerns regarding the proposed indemnification provision and the timeline of the negotiations, Plaintiff rejected the offer. (Id. ¶ 30.)

Plaintiff continued to seek repair of the pulling issue with his motorhome. (Sadeghi-A Decl. ¶¶ 31-33.) He also experienced an electrical issue, which continued until the end of the summer of 2017. (Id. ¶ 32.) Freightliner's litigation administrator Dennis Rostenbach categorized Plaintiff as a litigation threat and thus, flagged Plaintiff such that Rostenbach would be involved in any future communications with Plaintiff and any work on Plaintiff's motorhome needed to be approved by Rostenbach. (Lawder Decl., Ex. L, Hoover Dep. 127-29; Lawder Decl., Ex. M, Clay Dep. 64-65, 100; Lawder Decl., Ex. N.)

On September 5, 2017, Plaintiff brought the motorhome back to Young Trucks and stated that it was pulling left coming out of corner turns. (Warden

Decl. Ex. 11; Warden Decl. Ex. 12 at 1-2.)  During this visit, Defendant Freightliner's personnel, including engineer Todd Traynham, inspected the vehicle and performed an alignment, including of the tag axle.  (Warden Decl. Ex. 13, Traynham Dep. 174-180.)  Traynham obtained permission from Rostenbach to work on Plaintiff's vehicle.  (Id. 174-75.)  Traynham testified that he experienced the motorhome pulling left on a test drive.  (Traynham Dep. 171-74.)  He discovered that the tag axle control arms bolts were in the skewed, design-unintended position that caused the off-set, and the ride height adjustment link was also incorrect.  (Id. 175-78.)  Before performing the alignment, Traynham had the Comfort Drive – the Newmar computerized steering system – disconnected, which had a "large effect" on stopping the pulling.  (Id. 174).  Other adjustments were made including installing two shims and modifying the front ride height adjustment link by cutting it down and rewelding it an inch shorter.  (Warden Decl. Ex. 11; Warden Decl., Ex. 12 at 1; Sadeghi-A Decl. ¶ 34.)  Traynham performed the alignment according to instructions published in the August 9, 2016, PIB 458.  (Warden Decl. Ex. 13, Traynham Dep. 178-80.)

In October 2017, Plaintiff sought repair from Young Trucks, again claiming that his motorhome continued to pull to the left.  (Lawder Decl., Ex. M65.) Young Trucks forwarded Plaintiff's concerns to Rostenbach and, on October 11, Rostenbach told Young Trucks:

> [A]s of now FCCC will not spend any more time or Money for this unit as he continues to send letters to the Attorney General.  I will get with corporate legal to see if they want to do anything further. Last time our engineer was there everything was fine and the unit was put back in spec.

(Id.)

On October 25, 2017, at  Freightliner facility in Kentucky, Plaintiff reported pulling, and a technician "confirmed pulling to the left" and noted that the tag axle tires were "feather edged to the left side."  (Warden Decl., Ex. 16.)

### e)     2018 Repair Attempts

In March 2018, Plaintiff complained to Newmar of electrical issues. Newmar forwarded the concerns to Defendants.  Rostenbach told Newmar: "If your dealer finds the issue to be an FCCC issue we can pay them to fix the unit if it is a warranty failure.  We will no longer give any policy dollars towards this customer."  (Lawder Decl., Ex. P32.)

### f)     2019 Repair Attempts

11

On January 15, 2019, in San Diego, California, work was done on the tag axle tires and centering of the steering wheel.  (Warden Decl., Ex. 17.)  The repair notes state that "tag axle indicates turn wear in one direction."  (Id.)

On June 4, 2019, Plaintiff emailed Newmar and said he was still having problems with the tag axle alignment, and Newmar alerted Freightliner to Plaintiff's concerns.  (Lawder Decl., Ex. P8; Sadeghi-A Decl. ¶ 38.)  Rostenbach responded that Freightliner had verified repeatedly that Plaintiff's alignment was in specification and, "[a]s time goes on alignment becomes a maintenance issue and the customer is responsible for this.  If he takes it to a dealer and there is a warranty failure it can be repaired under warranty if not he will be responsible for the alignment." (Lawder Decl., Ex. P8.)  Newmar asked Rostenbach if "it would be best to have him bring it to the [Freightliner] service center in Gaffney."  (Id.)  Rostenbach responded: "No.  We are done giving him policy.  Unless it is broke it is his responsibility as Mainten[a]nce.  He can take it to any dealer [o]f his choosing."  (Id.)  On June 13, Rostenbach reiterated:

> Alignment is a maintenance item and will need to be check[ed] on a regular basis depending on the usage of your unit.  FCCC has attended several inspections and even purchased several tires for you as goodwill policy.  FCCC even sent an engineer to verify that the unit was in spec last year when the unit was at Young Truck Sales.  If you feel that there is a warrantable failure that has affected

the alignment of your unit then please present it to an authorized
Freightliner repair facility to be repaired and covered under the base
chassis warranty.

(Ex. P35.)

Through June 2019, Defendants never told Plaintiff that the USB tag axle

had a design defect, that it was misinstalled on his motorhome, that there was no

complete and permanent repair available, or that a new design that eliminated

the design defect had been in production since March 2017.  (Sadeghi-A Decl. ¶

39.)

In June and July 2019, Plaintiff had the motorhome's alignment checked at

again.  (Sadeghi-A Decl. ¶ 38; Sadeghi-A Decl., Ex. AAA; Warden Decl., Exs. 19-

20.)

### 5.    Service on the Motorhome after this Lawsuit Was Commenced

In October 2020, Plaintiff had the tag axle tires replaced.  (Warden Decl.,

Ex. 23.)

Plaintiff has continued to drive the motorhome throughout his ownership.

(Sadeghi-A Dep. 359-60.)  Plaintiff identified two instances where he considered

not using his motorhome: one instance involved a tire separation on the front

steer axle, and the other was when he had tag axle tire wear that was resolved by

a tire rotation.  (Sadeghi-A Dep. 359-60.)  In his declaration, Plaintiff averred: "I have experience driving racing vehicles so I am competent to drive with extra vigilance and care that is required to control the unpredictable tendencies of the Motorhome."  (Sadeghi-A Decl. ¶ 10.)

### 6.    Defendants' Development of the Tag Axle

In 2014, Freightliner began development of the passive steer tag axle for its recreational vehicle chassis, with the assistance of an axle supplier, Hendrickson USA, LLC.  (Am. Compl. ¶ 9; Answer ¶ 9.)

In January of 2015, during testing of the USB tag axle, one of the four control arm fastener bolts that hold the tag axle in place broke; however, the test driver noted no adverse handling effects from the missing bolt.  (Lawder Decl., Ex. B42, p. FCCC3819.)  No engineering was undertaken to validate the fastener bolt for use in this application and no analysis or report of the failed bolt was performed; instead, a longer and stronger bolt was used in production.  (Lawder Decl., Ex. A, Westnedge Dep. 52-53; Lawder Decl., Ex. C143.)  Three instances during testing revealed the following malfunctions of the lock-straight mechanism that controls the passive steer capability: the adjustment nuts fell off,

were worn down, or froze or seized in place preventing proper passive-steer function.  (Lawder Decl., Ex. B42 at FCCC3813, 3816, 3818.)

In April 2015, Defendants began production of the USB tag axles on recreational vehicle chassis.  (Am. Compl. ¶ 12; Answer ¶ 12.)  On July 31, 2015, Hendrickson responded to a Freightliner report that USB tag axles were manufactured off-center and asserted that it was not Hendrickson's fault. (Lawder Decl., Ex. A, Westnedge Dep. 53-65; Lawder Decl., Ex. A45.)  During August 2015, Freightliner and Hendrickson investigated and through testing discovered that the unintended lateral shifting of the USB tag axle was caused by the USB tag axle bolts that attach the right-hand upper and lower control arms in the hanger slots being out of vertical alignment.  (Id.; Lawder Decl., Ex. A46; Lawder Decl., Ex. B, Traynham Dep. 231-34; Lawder Decl., Ex. I, May 2016 Emails.)  This lateral shift behavior was not the design intent of the slotted attachment point.  (Id.)  The off-center tag axle caused drivability problems such as dog tracking ("back wheels not following directly behind front wheels"), pulling, wandering, vibration, and premature, abnormal tire wear.  (Traynham Dep. 46 (dog tracking); Lawder Decl., Ex. D118, McElroy Report at 2-3.) Freightliner and Hendrickson attempted to come up with a solution to the off-

center tag axle, such as a design change to the hangers, but continued

manufacturing the tag axle without any changes through the spring of 2016.

(Lawder Decl., Exs. A47, A48, A49, E; Lawder Decl., Ex. F, Panceroff Dep. 68, 71-

78; Lawder Decl., Ex. G2, PIB 458 at N197.)

On April 6, 2016, Freightliner design engineer Traynham emailed

Hendrickson and the Freightliner manufacturing team stating:

> We are receiving reports from sales and service that the tag alignment issue is causing issues at dealers.  The offset to the left due to improper assembly and alignment is causing lost sales.  At this point we need to consider removing the adjustment slots in the passenger side hangers.  . . .
>
> We have provided support and helped provide alternative methods to help give direction on USB assembly and alignment.  Nothing done to date has corrected the issue.  At this time we need to do something different to try to rectify the issue.  . . .

(Lawder Decl., Ex. A49.)

On April 29, 2016, Newmar emailed Freightliner, stating that Newmar had

been experiencing the coaches pulling based on off-center axles and providing

Freightliner with logs of vehicles with the issue.   (Lawder Decl., Ex. H.)  By this

time, Freightliner had also received multiple customer complaints about this tag

axle issue.  (See Lawder Decl., Ex. R.)  After several communications with

Hendrickson, in May 2016, Freightliner began a process of redesigning the USB

16

tag axle.  (Lawder Decl., Ex. I.)  In the fall of 2016, Defendants scheduled production for the redesigned USB tag axle to remove the slotted design in order to "reduce potential errors for axle alignment."  (Lawder Decl., Ex. F41; Lawder Decl., Ex. I.)

Plaintiff's chassis was manufactured by Freightliner before the manufacturing alignment procedures were updated in June 2016 and before the design changes were implemented in March 2017 to remove the slotted design in an attempt to reduce axle alignment errors.  (Lawder Decl., Ex. C, Rini Dep. 103; Lawder Decl., Ex. B, Traynham Dep. 232; Lawder Decl., Ex. F, Panceroff Dep. 179; Lawder Decl., Exs. F40, F41, I.)  Plaintiff's chassis was manufactured with the alleged defective slotted hanger design in April 2016, and an alignment attempt was performed on May 31, 2016.  (Lawder Decl., Ex. B36, FCCC990.)

### 7.    Customer Complaints

By the end of 2016, Freightliner had received more than 60 customer complaints and claims that Plaintiff interprets as related to the USB tag axle misinstallation offset and its effect on driving and tires.  (Lawder Decl., Ex. R.)  A dozen of those were for 2017 model motorhomes.  (Lawder Decl., Ex. S.)  By June

2019, Defendants had received approximately 350 tag axle-related complaints and claims.  (Lawder Decl., Ex. R.)

### B.    Procedural History

On July 29, 2019, Plaintiff served a Complaint on Defendants Daimler and Freightliner.  ([Docket No. 1] Notice of Removal ¶ 1.)  The Complaint was filed in Ramsey County Court on July 31.  (Id.)

On August 28, 2019, Defendants removed the matter to this Court. [Docket No. 1]   On August 30, Defendants filed an Answer to the Complaint in which they asserted various affirmative defense but did not assert lack of personal jurisdiction.  [Docket No. 7]

On March 23, 2021, Plaintiff filed an Amended Complaint against Defendants asserting: Count 1: Violation of Minnesota Lemon Law, Minn. Stat. § 325F.665; Count 2: Violation of Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq.; Count 3: Breach of Express Warranty; Count 4: Violations of Minn. Stat. §§ 325G.17-20; Count 5: Common Law Fraud; Count 6: Violations of Minn. Stat. §§ 325F.69 and 325D.44; and Count 7: Punitive Damages – Minn. Stat. § 549.20. [Docket No. 52]  On April 6, 2021, Defendants filed an Answer to the Amended Complaint in which they asserted various affirmative defense but did not assert lack of personal jurisdiction.  [Docket No. 53]

Defendants now move for partial summary judgment; they request that the Court dismiss, in their entirety, Counts 5-7 and dismiss Counts 1-4 to the extent they are based on the allegation that Defendants breached the express Warranty.

## III.   DISCUSSION

### 1.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### 2.   Breach of Express Warranty Claims

Counts 1-4 allege breaches of implied warranties under Minnesota law and the Magnuson-Moss Warranty Act and of the express Warranty provided by

19

Defendants with the sale of the motorhome.  The Court grants summary

judgment on the breach of warranty claims to the extent they are based on breach

of the express Warranty.

### a) Terms of the Limited Warranty

The express Warranty provides that for a period of 3 years or 50,000 miles,

Defendants' chassis "will be free from defects in material and workmanship that

occur under normal use."  The phrase "defects in material and workmanship"

refers to manufacturing defects: "defects in material and workmanship refer to

departures from a product's intended design while design defects refer to the

inadequacy of the design itself."  Bruce Martin Const., Inc. v. CTB, Inc., 735 F.3d

750, 753 (8th Cir. 2013).  As this Court has noted, "[t]he case law overwhelmingly

holds that design defects are not covered by warranties for materials and

workmanship."  In In re Hardieplank Fiber Cement Siding Litig., 284 F. Supp. 3d

918, 933-34 (D. Minn. 2018) (gathering cases).

Here, Plaintiff can point to no evidence that there is a defect in the material

or workmanship of the motorhome's chassis.  Plaintiff's own experts show that

no manufacturing defect existed.  Plaintiff's expert, Dr. William Guentzler,

20

testified that it was his opinion that the tag axle has a defective design and not a

manufacturing defect:

> Q. . . . [W]ere you asked to render an opinion as to whether the
> subject vehicle has a design or manufacturing defect?
>
> A. Yes.  And I definitely did say that I felt it was a design defect.
>
> * * *
>
> Q. And so as you sit here today, your opinion is that there is a
> design defect with respect to the subject RV?
>
> A. Definitely.
>
> * * *
>
> Q. . . . [A]s you sit here today, you aren't offering an opinion that
> there was a manufacturing defect with respect to the subject vehicle.
> Is that right?
>
> A. Well, I'm saying I think it was manufactured to the design, but
> the design is not a good design so there's a design defect.

(Warden Decl., Ex. 22, Guentzler Dep. 105-06.)

Plaintiff's other expert, Dr. Robert McElroy, testified that he had identified

no defects in materials or workmanship in the motorhome's chassis.  (Warden

Decl., Ex. 21, McElroy Dep. 261.)  Although McElroy uses the term

"manufacturing" defect in his declaration, reports, and deposition, he was

unable to actually identify any manufacturing defect and, instead, repeatedly

testified that, in his opinion, based on Defendants' design, "it's not possible to get a correct alignment for the USB tag axle on this vehicle."  (2d Warden Decl., Ex. 26, McElroy Dep. 250.)  McElroy's testimony was clear:

> Q: Okay. Have you identified any deviations in the manufacturing of this coach from what you see in the coach, and you've inspected it three times, and what a properly manufactured coach should be?
>
> A: I don't have enough information to arrive at a technical opinion to support or not support that answer.
>
> ***
>
> Q: Okay. So the only way to address what you perceive as the problem and the defect here is the change the design of the USB tag axle?
>
> ***
>
> A: Essentially.
>
> ***
>
> Q: And the solution, in your view, and the only solution in correcting this problem is to change the design of the tag axle.  Is that right?
>
> A: Yes.

(Warden Decl., Ex. 21, McElroy Dep. 254-55, 257.)

In McElroy's errata sheet, he attempted to substantively change his answer regarding the existence of a manufacturing defect.  (McElroy Decl. ¶ 10.)

However, in his declaration, he averred that he cannot opine on which "component [] was too large, too small, or misplaced" on Plaintiff's motorhome which may give rise to an allegation of an ongoing manufacturing defect. (Id. ¶ 11.)

The Court retains "discretion to strike substantive changes made in errata sheets, if the deponent fails to provide sufficient justification." Sanny v. Trek Bicycle Corp., No. CIV. 11-2936 ADM/SER, 2013 WL 1912467, at *14 (D. Minn. May 8, 2013) (citation omitted). An errata sheet "does not turn a deposition into a take home examination that allows a deponent to alter what was said under oath." Elsherif v. Mayo Clinic, No. CV 18-2998 (DWF/KMM), 2020 WL 6743482, at *2 (D. Minn. Nov. 17, 2020) (citation omitted).

The Court will disregard McElroy's attempts to alter his testimony in his errata sheet to state that a manufacturing defect existed. First, he tries to completely change the substance of his testimony with no basis other than claiming that he had forgotten facts or misunderstood the question. His explanation is not credible given the clarity of the repeated questions and the fact that he was deposed as Plaintiff's expert witness specifically to address the question of whether there was a manufacturing or design defect and, if so, what

23

it was.  In any case, even accepting McElroy's errata sheet, he fails to refute his repeated opinion that under no circumstances could the tag axle meet specification unless the design were changed.  Nor does any expert identify any particular "manufacturing" defect.

Plaintiff's sole defect allegation remains a design defect claim premised on the allegation that the tag axle cannot be properly aligned "regardless of how many times or how aggressively an alignment tries to overcompensate for such defective underlying conditions." (Am. Compl. ¶ 29.)  Such a claim cannot support Plaintiff's breach of warranty claims to the extent they are based on the express Warranty.  See In re Hardieplank Fiber Cement Siding Litig., 284 F. Supp. 3d 918, 933 (D. Minn. 2018) ("[A] defendant whose express warranty warrants a product against 'all defects in material and workmanship,' is entitled to summary judgment when a plaintiff's express warranty claim is based on design defects.").

### b)  Waiver

Plaintiff asserts that Defendants have waived any claim that his axle defect is not covered by the Warranty and have admitted that they are obligated to repair the tag axle under their Warranty.  Plaintiff asserts that Defendants have

produced evidence of more than 200 instances of similar claims that they paid

through their warranty program.  And Defendants characterized one of the tag

axle repair attempts on Plaintiff's motorhome, on November 21, 2016, as a

"warranty" claim and paid it in full.  (Lawder Decl., Ex. P23, p. FCCC151.)

Defendants paid other repair attempts to Plaintiff's tag axle that were

characterized as "policy."  (Lawder Decl., Ex. P23, pp. FCCC107,117,153.)

"Waiver is the intentional relinquishment of a known right."  Frandsen v.

Ford Motor Co., 801 N.W.2d 177, 182 (Minn. 2011).   Plaintiff bears the burden of

proving knowledge of the right and intent to waive that right.  Id.  "Waiver may

be express or implied—knowledge may be actual or constructive and the intent

to waive may be inferred from conduct."  Id. (citation omitted).  "Although

waiver can be express or implied, both types of waiver require an expression of

intent to relinquish the right at issue."  Id.  "[M]ere inaction" is insufficient.  Id.

The Court concludes that the evidence is insufficient to support a claim

that Defendants intentionally waived any assertion that the work on Plaintiff's

tag axle was not covered by the Warranty.  Regardless of whether the Court

considers the evidence of other customers' claims, evidence that Defendants

attempted to make a one-time repair of an axle complaint for other customers

does not establish that they intentionally waived the Warranty's limitation to coverage of manufacturing defects.  Even if Defendants provided warranty coverage to misaligned tag axles, this does not show an intent to waive because the tag axles could have been installed out of specification, i.e., misaligned. Plaintiff points to no evidence of a tag axle problem based on a design defect immediately recurring for other customers after the alignment.  (See also 2d Warden Decl., Ex. 24, Rostenbach Dep. 146-47 ("Alignments are a maintenance item unless there is a component found that has failed.  Then that would be covered under warranty.").)

Evidence that Defendants attempted to repair Plaintiff's alignment complaints as a goodwill "policy" gesture is not evidence of intent to relinquish their rights under the Warranty.  Plaintiff only points to one entry in Defendants' records that states that a repair was paid for under warranty.  Otherwise, Defendants consistently recorded that they paid for repairs under a goodwill "policy" until Rostenbach made the decision that Freightliner would make no more policy payments to Plaintiff.  There is no evidence that Defendants knew that Plaintiff alleged a design defect and that they intentionally decided to cover design defects under the Warranty for Plaintiff.

### c)   Estoppel

Plaintiff also argues that Defendants are estopped from denying that the tag axle defect is covered by the Warranty.

"A party seeking to invoke the doctrine of equitable estoppel has the burden of proving three elements: (1) that promises or inducements were made; (2) that it reasonably relied upon the promises; and, (3) that it will be harmed if estoppel is not applied." Hydra-Mac, Inc. v. Onan Corp., 450 N.W.2d 913, 919 (Minn. 1990).

Assuming without deciding that the Court can consider evidence of other customers' complaints and Defendants' payment to repair those complaints, the facts do not show estoppel.  There is no evidence that Defendants made any promises or inducements to Plaintiff who then relied upon them.  The fact that, unbeknownst to Plaintiff, Defendants repaired other customers' alignment issues cannot support estoppel.  And Plaintiff has failed to identify evidence showing that Defendants promised him all tag axle alignments would be a warrantable item under the Warranty.  Nor has Plaintiff pointed to any facts showing that the relied on such a promise to his detriment.

### 3.   Fraud Claims

Defendants assert that Plaintiffs' fraud claims fail because he cannot show the duty to disclose required to support a claim of fraud by omission; nor can he show that Defendants made affirmative, misleading representations.

### a)   Fraud Standard

The required elements of a fraud action are: (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance.

Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 532 (Minn. 1986).

The Minnesota Consumer Fraud Act provides:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

Minn. Stat. § 325F.69, subd. 1.  The plaintiff must prove that "the defendant engaged in conduct prohibited by the statutes and that the plaintiff was

damaged thereby." <u>Group Health Plan, Inc. v. Philip Morris Inc.</u>, 621 N.W.2d 2, 12 (Minn. 2001).  Reliance is not necessary.  <u>Id.</u>

### b)     Fraud by Omission and Duty to Disclose

"Nondisclosure does not constitute fraud absent a legal or equitable obligation to communicate facts to a particular person and that person is entitled to that information." <u>L & H Airco, Inc. v. Rapistan Corp.</u>, 446 N.W.2d 372, 380 (Minn. 1989) (citation omitted).  A duty to disclose facts may exist under special circumstances, such as 1) "when a confidential or fiduciary relationship exists between the parties;" 2) "when disclosure would be necessary to clarify information already disclosed, which would otherwise be misleading;" or 3) when one party "has special knowledge of material facts to which the other party does not have access." <u>Id.</u> (citations omitted).  As with common law fraud, under the Minnesota Consumer Fraud Act, "for an omission-based claim to be actionable, there must be a special circumstance that triggers a duty to disclose the omitted facts." <u>Graphic Commc'ns Local 1B Health & Welfare Fund A v. CVS Caremark Corp.</u>, 850 N.W.2d 682, 696 (Minn. 2014).

The Court concludes that Plaintiff has demonstrated that there is sufficient evidence to create a trial question regarding whether Defendants committed

fraud by omission based on having specialized knowledge of a design defect in Plaintiff's motorhome's tag axle and that no repair attempt could be successful and failing to disclose that information.

Viewing the evidence in the light most favorable to Plaintiff, there is evidence that Defendants knew that there was a design flaw in its tag axle at the time that they sold Plaintiff his motorhome and throughout the remainder of 2016 when they indicated to Plaintiff that they would fix the pulling issue on his motorhome. Furthermore, Plaintiff had no way to discover this information on his own.

For instance, in April 2016, Traynham stated that there were reports of tag alignment issues, nothing that Freightliner had done to date had been able to fix the problems, and Freightliner needed to consider design changes. In May 2016, still before Plaintiff took delivery of his motorhome, Freightliner began the process of redesigning the tag axle. And by fall of 2016, Defendants had scheduled production of the redesigned tag axle to prevent alignment errors. Plaintiff had no way to access this information, and it was material to his decision to purchase and not return his motorhome in 2016. See, e.g., Podpeskar v. Makita U.S.A. Inc., 247 F. Supp. 3d 1001, 1011 (D. Minn. 2017) (holding that a

plaintiff adequately pled a duty to disclose based on specialized knowledge when the plaintiff "alleged that [manufacturer] knew of the batteries' defects and that a buyer could not reasonably learn of the defect until after purchase"); Johnson v. Bobcat Co., 175 F. Supp. 3d 1130, 1146 (D. Minn. 2016) (holding plaintiff adequately pled duty to disclose specialized knowledge in fraud claim based on design defect in fuel tank when manufacturer "was in a superior position to know the true facts about their product [and] . . . to know the actual design of the loader" and also alleged that plaintiff "could not reasonably have been expected to learn or discover the misrepresentations at the time of purchase, in part because of the manner in which the customers fill their fuel tanks") (citation omitted); Cannon Techs., Inc. v. Sensus Metering Sys., Inc., 734 F. Supp. 2d 753, 767–68 (D. Minn. 2010) (denying summary judgment on buyer's fraud claim against manufacturer based on evidence that manufacturer "fraudulently concealed special knowledge, namely, the 336 Capacitor was defective as used in the iCon Meter's design and, hence, the meter ultimately would fail").

c)      **Affirmative Representations**

31

The Court rejects Plaintiff's assertion that his fraud claims can also survive based on affirmative fraudulent misrepresentations.  Plaintiff fails to point to specific statements by Defendants upon which he relied.  The only explicit statements highlighted by Plaintiff by Defendants were vague statements such as "We'll take care of this."  Based on Plaintiff's pleadings and the evidence in the record, his fraud claims are properly characterized as claims based on fraud by omission rather than fraud through affirmative misrepresentations.

### 4.    Personal Jurisdiction for Fraud Claims

The Court rejects Defendants' belated attempt to claim that the Court lacks personal jurisdiction over them with regard to the fraud claims.

Defendants removed this case to this Court in August 2019, answered the Complaint, answered the Amended Complaint, and submitted to the Court's jurisdiction and litigated this case for two years without ever raising the issue of personal jurisdiction.  They wholly failed to comply with Rule 12 by including the defense of lack of personal jurisdiction in a Rule 12 motion to dismiss or in their Answers.  This conduct constitutes waiver.  See Fed. R. Civ. P. 12(h) ("[A] party waives any defenses listed in Rule 12(b)(2)-(5) by: . . . (B) failing to either: (i) make it by motion under this rule; or (ii) include it in a responsive pleading or

in an amendment allowed by Rule 15(a)(1) as a matter of course.")  See also Alger

v. Hayes, 452 F.2d 841, 844 (8th Cir. 1972) (holding that defendant had waived

personal jurisdiction because "it is a well settled rule that if the defense is neither

raised by motion before answer nor stated in the answer, it cannot be raised for

the first time by motion after the answer").

Additionally, unlike in the cases cited by Defendants, Plaintiff's claims do

have connections to Defendants in Minnesota because Plaintiff purchased the

motorhome in Minnesota and first experienced axle-related drivability problems

with his motorhome in Minnesota.  Cf. Bristol-Myers Squibb Co. v. Superior

Court, 137 S. Ct. 1773, 1781-82 (2017) (holding no personal jurisdiction over

Plavix manufacturer in California when the plaintiffs were not California

residents and "were not prescribed Plavix in California, did not purchase Plavix

in California, did not ingest Plavix in California, and were not injured by Plavix

in California").

### 5.    Punitive Damages Claim

Under Minnesota Statute § 549.20, subdivision 1(a), "[p]unitive damages

shall be allowed in civil actions only upon clear and convincing evidence that the

acts of the defendant show deliberate disregard for the rights or safety of others."

A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

(1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

(2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Id., subd. 1(b).

"Punitive damages are an extraordinary remedy, and are awarded only where the harm complained of is the result of conduct done in malicious, willful, or reckless disregard for the rights of others." Wikert v. N. Sand & Gravel, Inc., 402 N.W.2d 178, 182 (Minn. Ct. App. 1987) (citing Wilson v. City of Eagan, 297 N.W.2d 146, 150 (Minn. 1980)).

The Court grants summary judgment to Defendants on the punitive damages claim. Under Minnesota law, "mere knowledge of a defect does not provide evidence of disregard for the rights and safety of others." Sobolik v. Briggs & Stratton Corp., No. CV 09-1785 (JRT/LIB), 2011 WL 13312292, at *2 (D. Minn. Jan. 12, 2011). In the product liability context, punitive damages based on safety risk are permitted "where a **significant** accident history demonstrated a

34

high probability of danger to others." Id.  The "mere possibility of injury" is

insufficient; "the Minnesota statute requires a showing of a **high probability** of

injury to consumers."  Sobolik v. Briggs & Stratton Power Prod. Grp., LLC, No.

CV 09-1785 (JRT/LIB), 2010 WL 11640191, at *5 (D. Minn. Nov. 3, 2010), aff'd,

2011 WL 13312292 (D. Minn. Jan. 12, 2011).  Here, there is no evidence of injury,

let alone death, to any consumer from the tag axle design defect.  Plaintiff's

expert and a Freightliner engineer each expressed a vague, general concern that

the defect could potentially cause a safety risk.  (See Lawder Decl., Ex. J, Nov. 2,

2016, Email from Traynham (identifying tag axle issues as "a safety relevant

issue for" Freightliner); Lawder Decl., Ex. D118, McElroy Report at 5; Lawder

Decl., Ex. D119, McElroy Supp. Report at 2.)  However, McElroy also testified

repeatedly that he witnessed no safety hazard when testing the motorhome and

had no safety concerns for Plaintiff driving his motorhome in the condition it

was in.  (Warden Decl., Ex. 21, McElroy Dep. 130, 156, 211, 217).  In his

declaration, Plaintiff averred: "I have experience driving racing vehicles so I am

competent to drive with extra vigilance and care that is required to control the

unpredictable tendencies of the Motorhome."  (Sadeghi-A Decl. ¶ 10.)  And given

that, viewing the evidence in the light most favorable to Plaintiff, there were

hundreds of complaints about the alleged defect and not one resulted in a vehicle accident, let alone injury, there is simply not clear and convincing evidence that Defendants willfully disregarded the safety of others.

Nor is there clear and convincing evidence that Defendants willfully disregarded the rights of others. Plaintiff claims that Defendants knew there was a defect with the tag axle and failed to disclose that to him and other customers, causing him to incur money, time, and frustration trying to repair his vehicle. However, he also admits that Defendants paid for numerous repair attempts on his vehicle, sent an engineer to attempt to repair his vehicle, assisted in the issuance of the PIB, redesigned the tag axle to attempt to avoid the problem in the future, and attempted to fix axle issues on other customers' vehicles. There is no evidence that Rostenbach directed that Plaintiff's warranty rights be curtailed – rather, Rostenbach stated that Defendants would no longer pay for repairs under their goodwill policy but that if an authorized provider found a problem covered by the Warranty, Freightliner would pay the provider to fix it. Viewing the evidence in the light most favorable to Plaintiff, this does not rise to the level of clear and convincing evidence of willful disregard necessary for punitive damages.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

Defendants' Motion for Partial Summary Judgment [Docket No. 88] is **GRANTED IN PART** and **DENIED IN PART** as follows: Counts 1 through 4 are **DISMISSED WITH PREJUDICE** to the extent that they are based on the allegation that Defendants breached the express Warranty; Count 7 is **DISMISSED WITH PREJUDICE**; and Counts 5 and 6 **REMAIN**.

Dated:   March 14, 2022                           s/Michael J. Davis
                                                  Michael J. Davis
                                                  United States District Court